John Demikis, Appellee, v. One Cent Club, Inc., et al., Defendants.

Appeal of One Cent Club, Inc. and Northern Trust Company, Appellants.

Gen. No. 42,391.

Opinion filed May 10, 1943. Rehearing denied May 24, 1943.

LORD, BISSELL & KADYK, of Chicago, for appellants.

RICHARD HILL, JR. and JOHN O. WAGNER, both of Chicago, for appellee.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

In an action brought under section 14 of the Dram Shop Act (Ill. Rev. Stat. 1941, ch. 43, par. 135 [Jones Ill. Stats. Ann. 68.042]) and on trial by jury plaintiff had a verdict in his favor for $8,870. At the conclusion of all the evidence a verdict was directed in favor of defendant William Oppenheim and motions for a directed verdict in favor of other defendants were reserved and the cause given to the jury with the result stated. Each defendant after return of the verdict,

made a motion for judgment notwithstanding, which was denied, and a final judgment in favor of plaintiff for the amount of the verdict entered.

It is contended for reversal the verdict is clearly against the manifest weight of the evidence and that a new trial should have been granted for that reason; also, that the verdict is excessive, and further that instruction No. 6 requested by the plaintiff and given by the court was erroneous.

The question of whether the verdict is clearly and manifestly against the weight of the evidence is, the controlling question. We have given careful consideration to the testimony of the witnesses for both parties. While recognizing our duty in this respect, we cannot disregard the rules applicable in the determination of this question. A jury and a presiding judge, all of whom saw and heard the witnesses, have concluded plaintiff was entitled to the verdict and that judgment should be entered on it. We are slow to set aside a verdict thus approved unless for a compelling reason.

The evidence is sharply conflicting. Some of it on both sides is, we are satisfied, untruthful. The task of weighing evidence under such circumstances is beset with many difficulties.

Plaintiff is 29 years of age and lives with his parents at 3128 Warren avenue. He was not working at the time of this occurrence, which took place in the early morning of October 24, 1938, while he was in defendant's tavern the One Cent Club, at No. 3201 West Madison street in Chicago, operated by William Oppenheim. Oppenheim opened the tavern in 1937 and closed out business in 1940. In the business two bartenders were employed, Al Sampson (also known by the name of Rosen) and Ted Galla. Sampson was about 5 feet 10 inches in height and weighed, he said, 190 pounds. Gertrude Raymond was employed in the place as a waitress. She testified she was present at the occur-

rence. This is corroborated by some and denied by other witnesses. She worked in this place from the time it opened in 1937 until it closed. Edna Prentiss was "dice girl." She did not testify. Oppenheim says whenever there was any trouble in the tavern he always tried to stop it personally; "Once in a while somebody might stagger in and start a little disturbance and we would walk them out." The one thing entirely certain from all the testimony is that plaintiff went to this resort on the early morning of October 24, 1938, and while there was struck by Rosen, alias Sampson, and his jaw broken. Plaintiff says (and a number of witnesses corroborate him) that a blackjack was used by Sampson. Sampson says he only used his fists. There is no doubt of the injury to plaintiff's jaw by whichever method brought about. The complaint avers the specific facts to which plaintiff testified. The answer of the defendants was in the nature of a general denial.

Oppenheim says plaintiff entered the resort close to closing time 1:30 and 2:00 o'clock, on the morning of October 24. He did not remember more than two people who were sitting at the front end of the bar at that time, "a fellow and a girl." Sampson was there, but Oppenheim says he did not see Sampson take a drink with any customer and did not see Sampson take any drink at all. Oppenheim also says that plaintiff did not have anything to drink in his place. He says plaintiff was there about 5 or 10 minutes, had a fight with Rosen (or Sampson) and went outside. He says plaintiff afterward came in again. Oppenheim was standing near the entrance and after plaintiff was hit told him to see a doctor and that he (Oppenheim) would pay his bills. Oppenheim says he did not know at that time plaintiff's jaw was hurt but his nose was bleeding.

October 23, 1938, fell on Sunday. Plaintiff testified that on the afternoon of that day he went to Wau-

conda, Illinois, with his friend, Frank Crossin, Crossin's brother and the brother's wife; that they visited with friends, a group of six or seven, and had about 2½ gallons of beer. Upon his return from Wauconda he went to this tavern, which was about a block and a half from where he lived, to see if his friend, Tom Hickey, was there. When he entered he found his friend, Edward McNamara. Plaintiff says he went to the end of the bar where McNamara was; that a beer was ordered for each and they sat there talking. A fight started between some men at the center of the bar. They saw the bartender, Sampson, reach for a blackjack and decided to take their leave. Just as he was passing, Sampson (who plaintiff says was drunk) wheeled around and hit him with the blackjack.

This testimony of plaintiff is corroborated by the testimony of John Mosley, a window trimmer, who was working at 6316 Stony Island avenue, lived in Melrose Park, and had stopped at the tavern on his way home. Mosley says that Sampson was under the influence of liquor; that Oppenheim and others were drinking with him; that he and plaintiff started to get out when Sampson used the blackjack and struck plaintiff with it. The evidence shows Mosley was not before acquainted with the plaintiff.

McNamara, plaintiff's friend, also corroborates his testimony as to the drinking by Oppenheim and Sampson, and the use of the blackjack. McNamara says Mosley helped him put plaintiff into his car and that he drove him home.

Frank Crossin corroborates plaintiff as to the trip to Wauconda, his return from there, and says he dropped him off in front of the tavern and that plaintiff was entirely sober.

On the other hand, Sampson testified plaintiff came into the tavern staggering and seemed intoxicated; that he went to a table, put his arms on the table and his head on his arms; that the waitress went over to

him and shook him; that he raised his head up and she told him he couldn't sleep there, and he then called her a very nasty name; that she went to Sampson and told him what had occurred, and Sampson went over to plaintiff and shook him. Sampson says plaintiff lifted up his head and said, "Who are you?" Sampson says he told him and also told him plaintiff had had enough to drink and that he couldn't sleep there. Plaintiff braced himself up. Sampson took him by the right arm and walked him to the front door. Plaintiff walked out but in about two minutes walked back in. Then Sampson, with the help of Oppenheim, (each taking plaintiff by the arm) walked him to the front door again. Sampson walked out with him. By this time Sampson felt a swing on the back of his neck, turned around and found plaintiff had raised his hand to fight. Thereupon, Sampson says, he hit him and knocked him down. Fifteen or twenty minutes afterward, according to Sampson, plaintiff again walked in, and Sampson did not see him afterward. Sampson had been trained as a prize fighter but had never, he says, actually followed his profession.

Gertrude Raymond, the waitress, corroborates Sampson's story as to the incident at the table. Plaintiff on rebuttal said he had never seen her before, and that she was not at the tavern at the time of the occurrence.

William Woods, who keeps a tavern at 3208 Lake street, testified that with a "lady friend" he went into defendant's tavern at about 1 o'clock on the morning in question and stayed until 2 o'clock. He corroborates to a certain extent the testimony of Sampson, Oppenheim and Gertrude Raymond, as to the details of the occurrence. Wood's girl friend did not testify. Woods said he went to the One Cent Club at this time because Oppenheim was a friend.

After this suit was started, and on September 16, 1939, defendant caused the deposition of plaintiff to

be taken. It was transcribed by Frederick Julian, a court reporter. Defendant argues that statements made by plaintiff at the time of the taking of his deposition were so contrary to and inconsistent with plaintiff's evidence given at the trial as to compel the conclusion plaintiff is unworthy of belief. Julian testified he took plaintiff's testimony and dictated it into a dictophone from which it was written up. His testimony tends to show plaintiff then said McNamara went to Wauconda with plaintiff; that plaintiff entered the tavern with him when he returned; that together they went up to the bar and had several drinks and bought a drink for the bartender; that plaintiff said he was not able to say the bartender was intoxicated, and that he admitted that at that time he, himself, had begun to feel the effects of the liquor he had taken.

We have not overlooked but endeavored to give due weight to the Julian testimony. It is not corroborated and material parts of it are denied by plaintiff. The deposition was not read over to plaintiff nor by him after it was written up, and he never signed it. The testimony of plaintiff at the trial was certainly consistent with the allegations of his complaint filed prior to the taking of the deposition. The trial judge stated at some length reasons for denying the motion for a new trial and for his conclusion that the verdict was not against the weight of the evidence. His statement shows he did not overlook the Julian testimony nor the fact that on the plaintiff was cast the burden to prove his case by a preponderance of the evidence. We cannot find it to be our duty to hold he erred in entering judgment on the verdict of the jury. The kind of injury inflicted and the inferences to be drawn from the nature of it strongly persuades us the narration of the occurrence by plaintiff's witnesses is more probable than that of Sampson.

It is next contended the verdict is excessive. This contention is without merit. Giving due consideration

to all the testimony on both sides it is impossible to consider the occurrence in any other light than that of an unjustified and brutal assault. The case is one where under the law punitive damages might be properly imposed by the jury. The trial judge said that if only actual damages had been allowed he would not have regarded the verdict as excessive. On the day following the assault plaintiff was taken to the hospital. He was treated until April 1939. An X-ray was taken; the maxillary bone and the mandible of the lower jaw were wired together; the last molar tooth in the right lower jaw was removed. The food given plaintiff was liquid, solid food being prohibited. Plaintiff swallowed his food through a tube. The jaw was shortened a quarter of an inch. The injury was permanent. He cannot yet open his mouth as formerly. He complains of pain when opening the mouth and of numbness of the jaw and of the chin. The bill of the doctor was $250. Plaintiff is a young man. As a result of this brutality he will go through life maimed. We cannot under these facts and in view of the right of the jury to impose punitive damages, hold the judgment excessive. On the contrary we agree with the statement of the trial judge that the amount of the judgment would be justified even if the jury had been limited to actual damages.

It is finally contended the court erred in giving the sixth instruction requested by the plaintiff. By this instruction the jurors were told that in determining the amount of damages in case they should find for the plaintiff on the issues, they would have a right to consider "the nature and extent of plaintiff's physical injuries, if any, so far as they are shown by the evidence; his pain and suffering if any, resulting from such physical injuries, any permanent injury or disfigurement to his face or impairment and the loss of use of his jaws if any." The defendants contend that this instruction is contrary to the law as stated in *Chicago City Ry. Co. v. Anderson*, 182 Ill. 298.

In the *Anderson* case the Supreme Court affirmed the judgment of this court, which affirmed the judgment of the trial court (80 Ill. App. 71). Reversal was urged for the reason, as argued, that an instruction given told the jury that in estimating damages, if any, plaintiff's "pain and suffering" might be considered. The objection was not allowed but the opinion went on to state: "The mental pain that may be considered and allowed for in this class of cases is such as is the direct result or concomitant of the physical pain suffered." The opinion then went on to say that "mental pain" that comes from "the humiliation of going through life in a crippled condition, is too remote to be considered an element of damage." The remark was merely obiter and not directed at any point actually raised in the case.

In *Cullen v. Higgins,* 216 Ill. 78, 84, plaintiff had judgment where an instruction had been given that the jury might take into consideration the question of whether plaintiff had been "marred physically." The court said the instruction, "in the form in which it was framed," should not have been given. It also pointed out that there was no evidence on which to base the instruction.

In *Chicago City Ry. Co. v. Smith,* 226 Ill. 178, objection was made that an instruction told the jury that it might consider "to what extent, if any, he has been injured or marred in his personal appearance," and to what extent he might have endured mental and physical suffering as a natural and inevitable result of such injury. The opinion of the Supreme Court (which was by the same justice who wrote the opinion in the *Cullen* case) said that the instruction was based on the evidence and was not subject to the objection raised in the *Cullen* case and affirmed the judgment of the Appellate Court.

In *Fitzgerald v. Davis,* 237 Ill. App. 488, the third division of this court considered a case where the court instructed the jury that plaintiff could not recover

"any damages on account of the disfigurement or marring of her personal appearance." The plaintiff had received a cut on the face as a result of the injury for which she sued. This court said this instruction was more favorable to defendant "than he was entitled to under the law." The opinion states:

"The law only prohibited the recovery of damages in such a case for mental suffering which results from embarrassment or chagrin and which suffering has no relation to physical pain. *Chicago City Ry. Co. v. Anderson,* 182 Ill. 298. She might recover for disfigurement which resulted from the accident.

"We think the argument of counsel taken in connection with the facts in the case was clearly insufficient to warrant us in disturbing the verdict and the judgment."

In *Nosko v. O'Donnell,* 260 Ill. App. 544, 554, the same question was considered. We there said:

"Defendant also contends that the court erred in refusing to give as requested by defendant an instruction that the marring of personal appearance and humiliation resulting from the contemplation of bodily disfigurement are not elements entering into computation of pecuniary damages for personal injuries sustained by reason of alleged negligence, and it is asserted that the question of law raised by the refusal of the court to give the instruction 'has never been put squarely to the Supreme Court.' Defendant says the question was not before the court at all in *Chicago City Ry. Co. v. Smith,* 226 Ill. 178. We do not so construe that case. Moreover, the question was passed on in *Fitzgerald v. Davis,* 237 Ill. App. 488, and we adhere to that decision."

In 15 Am. Jur., § 186, pp. 605, 606, that authority states:

"There is a conflict of authority as to whether a recovery may be had for mental suffering, mortifica-

tion, and humiliation arising from the disfigurement of the plaintiff's person. Some courts hold that such suffering is a proper component part of that mental suffering for which redress in monetary damages may be given. Under this rule, such suffering as is reasonably certain to be endured in the future on account of such disfigurement may be compensated for. Other courts take the view that mental suffering caused by disfigurement is too remote and indefinite to constitute a proper element of damages.

"In some jurisdictions there can be no recovery for mental suffering caused by disfigurement of the person where the injury causing the disfigurement was not caused maliciously, and the disfigurement is of such a character that it cannot possibly render the plaintiff's presence objectionable to any person or result in making him an object of pity or ridicule."

The authorities are collected in L. R. A. 1916 E, in a note to *Patterson v. Blatti,* p. 898. The ground of objections to the allowance of such damages is that they are too speculative and remote. The instruction here is not subject to that objection. The instruction limits the damages which may be recovered to "any permanent injury or disfigurement" resulting from physical injuries. We are unable to conceive of any reason why the consideration of such damages should be excluded, and this holding is in conformity with the ruling of the Supreme Court, as we understand the decisions.

There is no reversible error in the record, and the judgment will be affirmed.

*Affirmed.*

O'CONNOR and McSURELY, JJ., concur.