Jack Simon, Appellee, v. Maurice I. Kaplan, Appellant.

Gen. No. 42,750.

Heard in the first division of this court for the first district at the October term, 1943. Opinion filed January 24, 1944.

LORD, BISSELL & KADYK, of Chicago, for appellant.

FINN & FITZPATRICK and FRANK P. KRONENBERG, all of Chicago, for appellee.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought an action against defendant to recover damages claimed to have been sustained by him through the negligence of defendant, a physician, in the use of an x-ray machine on plaintiff's face in an endeavor to cure barber's itch. There was a verdict and judgment in plaintiff's favor for $4,500 and defendant appeals.

The record discloses that defendant is a physician licensed to practice in Illinois since 1913, and for a number of years has been associate professor at the Chicago Medical School where he teaches radiology two days a week and where he holds a clinic Friday afternoons for a group of students; that since 1922 his practice has been limited to the use of x-ray in the diagnosis and treatment of ailments; that plaintiff, who was about 45 years of age, had been employed for a number of years as a shoe salesman and was troubled with what is commonly known as "barber's itch" which developed about February, 1941. May 17, 1941 he went to the clinic at the Chicago Medical School, and after an examination was referred to defendant because the clinic had no x-ray machine, and on May 29 defendant treated plaintiff's face using an x-ray machine.

The evidence is further to the effect that at and before the time plaintiff went to the clinic his face was swollen, many pustules were exuding pus, the skin on his face was cracked and bleeding and there were some scabs.

Defendant's testimony is to the effect that he used the machine 3½ minutes on each side of plaintiff's

face where it was affected; that the machine was automatically shut off by a time mechanism at the end of $3\frac{1}{2}$ minutes, while plaintiff's testimony is to the effect that each side of the face was treated about 10 minutes. After the treatment the doctor told plaintiff to return in about 10 days but he did not return until about two weeks, at which time his face was red and at that time defendant gave him some salve and told him to return in about a week or ten days, when defendant would give him another x-ray treatment. Plaintiff did not return and did not see any doctor until June 19, when he saw Dr. Caro, a skin specialist, who thereafter treated him two or three times a week at first, later about twice a month and then saw him about once a month to the time of the trial which began January 4, 1943.

Dr. Caro, a licensed physician, called by plaintiff, gave testimony to the effect that he had many years of experience in the field of diseases of the skin—dermatology—and had been engaged in the treatment of skin diseases for a number of years. He described the condition of plaintiff's face when he first treated him on June 19, 1941; that plaintiff was troubled with the so-called barber's itch; that he diagnosed plaintiff's condition as "an acute dermatitis, produced, probably, by radiation. That is x-ray." That he treated plaintiff a number of times after that day and his condition improved in September or October, 1941. That "At the present time he shows the effects that we usually see in chronic x-ray burn;" that "I use x-ray in my work and have used it since 1928, for fourteen years. I use it in my work only in treating skin conditions. I have had occasion to treat x-ray burns in my practice . . . I have treated at least ten or fifteen cases of x-ray burns in a year." And he gave as his opinion that if proper dosages of x-ray were applied the hair of the face should not fall out permanently, that "atrophy of the skin with discoloration and enlargement of

the veins should never follow with the dosages that are ordinarily used.''

Dr. Uhlmann (called by plaintiff) a licensed physician for many years, who appears to have been qualified, testified that he specialized ''in radio-therapy, x-ray, diagnostic and therapeutic:'' that he had used x-ray in his work since 1925; that he was familiar with the customary use of x-ray in the treatment of barber's itch; that he had had experience with x-ray burns for the past 14 years; that he saw plaintiff a few days before the trial and observed in his face several signs of disease which he proceeded to mention; that the condition he found on the upper part of the face ''could not be due to barber's itch or the after effects of barber's itch.'' In answer to a hypothetical question he testified: ''The logical conclusion is that the patient received more x-ray to the upper part than he received in the lower part of his cheeks;'' that in his opinion, the treatment mentioned in the hypothetical question ''would not be usual and customary for a specialist to apply enough x-ray to bring about a condition of atrophy of the skin, thinning of the skin, with erosions.''

Defendant in his own behalf testified that he had been a licensed physician since 1913, and mentioned further facts to show that he was qualified to treat patients for barber's itch. ''In 1914 I began to do x-ray work and gradually went into that until about 1922, when I quit general practice and went into x-ray work exclusively. In 1917 or '18 I became the head of the x-ray department of the Mt. Sinai Hospital of Chicago and maintained that position until 1934.'' During that period he had taken courses at Johns Hopkins, the Mayo Clinic and Washington University. ''Since 1922 I have limited my practice entirely to radiology, and that is the practice of x-ray diagnosis and x-ray therapy.'' That he maintains an office in Chicago and for 10 or 12 years has been associate pro-

fessor at the Chicago Medical School. "I teach the seniors radiology, and on Friday afternoons I hold a clinic there where I have groups of students. 'Radiology' is the science of x-ray." That he treated plaintiff on May 29, 1941, plaintiff having been sent to the doctor from the clinic, and found "numerous pustules with a redness all over his face including his lips, . . . His face was quite swollen. Many of these pustules were exuding pus. There were many areas that were cracked and they were bleeding, and the incrustations on the face were caused by the exudation of the serum together with the pus and blood, and they were vari-colored from pink to a greenish yellow." That plaintiff was suffering from what was commonly known as "barber's itch." That he applied the x-ray machine 3½ minutes to each side of plaintiff's face. That "It is common after an x-ray exposure on an inflamed surface, that the skin becomes red, and after that redness or erythema subsides, then another x-ray exposure is given. That is the common practice and I have been practicing on patients right along for the last thirty years." He further testified that he had been treating cases of barber's itch, about 200 of them, before he treated plaintiff and that he had treated many cases since that time. That "The treatment that I gave the plaintiff on May 29, 1941, was the same kind of treatment ordinarily and customarily given by me to patients suffering from the barber's itch. In fact, he received a less number of R units than I have given to quite a number of others."

On cross-examination he testified he gave plaintiff 217 R units on each side of the face making a total of 434. Defendant produced a card which he had prepared as a part of his office record at the time he treated plaintiff on which it appears that he gave defendant "three and a half minutes to each side of the face, 500 R." And continuing on cross-examination he testified with some uncertainty and hesitation that

the 500 R which appeared on the card was the number of units he intended to give plaintiff and that he had not given him more than 217 R's during the treatment, on each side of the face.

Dr. James T. Case, called by defendant, testified that he was a "radiologist and physician, practicing specialty radiology." That he was a graduate of many schools and was professor of radiology in the Northwestern University Medical School in 1912 and was head of the x-ray department from that time to the present—a period of 31 years. That his practice had been confined almost wholly to radiology. "That means x-ray and radium." That he had treated 200 or 300 cases of barber's itch by x-ray. In answering a hypothetical question he testified that a total dosage of 500 R units to be given in two different treatments, "I would say that he [the doctor giving the treatments] was quite within the ordinary and usual proper practice." That if 500 R units were given to each cheek in one treatment, "That would be somewhere near the upper limit of the proper dosage, it wouldn't be far from it."

Defendant also called Dr. I. S. Trostler, who testified as to his qualifications and that he had taught x-ray in several Chicago institutions and also had given private lessons to students; that during his practice he had treated 50 or 60 cases of barber's itch through radiology over a period of approximately 35 years. In answer to a hypothetical question he said that if 217 units were given in the treatment of barber's itch he would consider that according to the usual practice of physicians of skill in using x-ray in Chicago. And that if the patient was given 500 R units on each cheek in a treatment for barber's itch he would think this was the proper practice.

Counsel for defendant say that before a recovery can be had in a malpractice case it must be shown by affirmative evidence that the physician was unskillful

and negligent and that his want of skill caused plaintiff's injury. We think this is a correct statement of the law. *Lucarelli v. Winters*, 320 Ill. App. 359 (Abst.); *Wallace v. Yudelson*, 244 Ill. App. 320; *Schireson v. Walsh*, 354 Ill. 40. Counsel further contend that the liability of a physician for injuries caused by the misuse of an x-ray machine rests upon the same principle of law as any other branch of medicine or surgery. We think this is also the law.

It is contended (1) that the court erred in permitting expert witnesses called by plaintiff to answer directly questions that were to be decided by the jury. (2) That the diagnosis of plaintiff's expert witnesses, that plaintiff's condition was due to x-ray exposure, is not supported by the facts and (3) that the court erred in instructing the jury.

(1) It is argued by counsel that the medical experts called by plaintiff were permitted to testify directly that the x-ray treatment caused plaintiff's condition rather than that it might or could have caused his condition and that this is contrary to the rule of law announced by our Supreme Court in *Fellows-Kimbrough v. Chicago City Ry. Co.*, 272 Ill. 71. It might to some slight extent appear that plaintiff's expert witnesses testified directly that the x-ray treatment given caused plaintiff's condition but upon examination of their testimony we think it clear that they were but giving their opinion that the treatment might or could have caused plaintiff's condition and that the jury were not misled.

(2) Whether the verdict of the jury in plaintiff's favor (finding in effect that defendant was negligent in applying the x-ray treatment to plaintiff's face) is supported by the evidence, we are of opinion that we are unable to say that the finding of the jury is against the manifest weight of the evidence. Plaintiff called two experts who gave testimony tending to show that defendant had been negligent in treating plaintiff. On

the other side, defendant and two other experts gave testimony to the contrary. In these circumstances we are not warranted under the law, in disturbing the verdict of the jury.

(3) Complaint is made that the court erred in giving instruction Nos. 15 and 16 requested by plaintiff. Each of these instructions was on the question of the amount of damages in case the verdict should be for plaintiff. By instruction No. 15 the jury were told, "If, under a preponderance of the evidence and instructions of the court, the jury find the issues for the plaintiff and that said plaintiff has sustained damages by reason of physical pain and suffering undergone by him as a natural, direct and proximate result of negligence of the defendant, as charged and alleged by the plaintiff"—the instruction continues as to what they should consider in arriving at the amount of the damages. The complaint to this instruction is that it, in effect, told the jury that if they found from a preponderance of the evidence, under the instructions of the court, that plaintiff suffered damages as a result of defendant's negligence, it in effect, assumed that the defendant was negligent. We think this objection is hypercritical, and while it would have been better to have told the jury that if they found plaintiff suffered damages as a proximate result of defendant's negligence, if any, yet it did not direct a verdict, and we think the jury were not misled because they were told in another instruction that "If you believe from the evidence in this case that the defendant used ordinary care and skill in his treatment of plaintiff, and exercised his best judgment in such treatment, then it is your duty under the law to find the defendant not guilty." Moreover the instruction told the jury they must find plaintiff was damaged as a result of defendant's negligence "as charged and alleged" by plaintiff in his complaint.

The complaint made to instruction No. 16 is that it told the jury that if they found for the plaintiff from a preponderance of the evidence under the instructions of the court in fixing the amount of damages, if any, they should take into consideration all the evidence pertaining to plaintiff's injuries which were the proximate result of the failure of the defendant to exercise ordinary skill and care in the application of x-ray treatment and that they should also take into consideration whether plaintiff had been marred in his personal appearance, etc. What we have said about instruction No. 15 is applicable here. Another objection to this instruction is that in fixing plaintiff's damages the jury might take into consideration plaintiff's marred personal appearance. In *Fitzgerald v. Davis,* 237 Ill. App. 488, we held that plaintiff's marred personal appearance was a proper element for the jury to consider in fixing the damages. We there said: "The law only prohibited the recovery of damages in such a case for mental suffering which results from embarrassment or chagrin and which suffering has no relation to physical pain. *Chicago City Ry. Co. v. Anderson,* 182 Ill. 298. She might recover for disfigurement which resulted from the accident." To the same effect is *Nosko v. O'Donnell,* 260 Ill. App. 544; *Demikis v. One Cent Club, Inc.,* 319 Ill. App. 191 and *Chicago City Ry. Co. v. Smith,* 226 Ill. 178. In the *Smith* case where the jury were instructed that they might consider plaintiff's marred personal appearance in estimating the damages, it was held the instruction was warranted. The court there said: "In regard to the first objection [marred personal appearance] pointed out to this instruction, the evidence shows that appellee was more or less disfigured about his face, head and shoulder, . . . when all the evidence is considered, there is a substantial basis in it to warrant the instruction."

Of course every one knows that the disfigurement of one's face which is the result of defendant's negligence often may cause damages, for example, plaintiff may be unable to secure employment on account of such disfigurement.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

NIEMEYER and MATCHETT, JJ., concur.