**SHEHEE et ux.**

v.

**AETNA CASUALTY & SURETY CO.**

Civ. A. No. 4085.

United States District Court
W. D. Louisiana, Shreveport Division.

June 17, 1954.

Booth, Lockard, Jack & Pleasant, Shreveport, La., for plaintiffs.

Theus, Grisham, Davis & Leigh, Monroe, La., Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for defendant.

St. Clair Adams, Jr., New Orleans, La., for Louisiana Medical Society (not a party, but actively interested).

DAWKINS, Jr., Chief Judge.

The action is for damages arising from alleged medical malpractice. Defendant, as the insurer of the doctors involved, is sued alone and directly[1] under the Diversity Statute.[2]

Following an extended trial to a jury, and after deliberations of more than seven hours, a verdict was rendered for plaintiffs in the sum of $64,116.01. Of that amount $4,116.01 was for hospital, nursing, and incidental expenses. The balance was awarded for pain, mental anguish and disability.

Defendant has moved for judgment n. o. v. and, alternatively, for a new trial. Presented for decision are a number of points. They will be dealt with seriatim.

The background facts are these: Dr. Shehee is a prominent, respected dentist. He and his wife live in Arcadia, Louisiana. On June 19, 1952, a diagnostic medical procedure known as an esophagoscopy was performed upon Mrs. Shehee at a hospital in Ruston, Louisiana, about twenty miles from their home. This was done by Dr. H. H. Harms, a member of the Green Clinic at Ruston. The Clinic is a partnership of doctors, one of whom, Dr. Marvin T. Green, participated in the case, but not in the esophagoscopy itself. His professional activities consisted of examining Mrs. Shehee beforehand and in prescribing her post-operative treatment.

Admittedly, her esophagus was punctured during the procedure carried out by Dr. Harms. Almost immediately serious infection developed in her mediastinum or chest cavity. In the ensuing weeks and months she became critically ill, underwent three additional major operations, and a large number of minor ones. Her suffering, both physical and mental, was excruciating, as will be shown later in more detail.

The suit was filed on April 9, 1953. As the basis of damage claims by Mrs. Shehee for $100,000, and by Dr. Shehee for $18,460.23, plaintiffs alleged three grounds of malpractice:

1.) That the esophagoscopy was performed without the patient's consent, express or implied;

---

1. Under the Louisiana Direct Action Statute, LSA–R.S. 22:655.

2. 28 U.S.C.A. § 1332.

2.) That it was negligently, unskillfully and improperly carried out, causing the puncture;

3.) That she was given improper, negligent and unskillful post-operative treatment, which seriously aggravated her condition and necessitated the additional operations and treatment.

After several preliminary motions were overruled, defendant answered. It categorically denied plaintiffs' allegations of malpractice; and affirmatively averred that all due and proper skill had been exercised by the doctors.

As might have been expected, the issues were vigorously contested at the trial. At the close of plaintiffs' evidence, and again after all the evidence was in, defendant moved for a directed verdict. We reserved judgment. As stated, a verdict was rendered for plaintiffs in the figures mentioned above. Further, at the request of defendant, we submitted to the jury a single interrogatory,[3] reading, "Did Mrs. Shehee consent to the performance of the esophagoscopy?" The jury's answer was "No".

The motions for a directed verdict, reurged as defendant's first point in its motion for judgment n. o. v., were based upon plaintiffs' alleged failure to prove negligence, or malpractice, as a proximate cause of their damages. This was a jury question, pure and simple: Plaintiffs presented abundant evidence showing lack of consent, an element conceded by defendant to constitute malpractice; and they showed, by testimony from a highly qualified and reputable Shreveport surgeon, that the doctors did the wrong thing in prescribing an unsterile diet for the patient, when they knew her esophagus was punctured, thereby permitting bacteria to enter her chest cavity, producing the infection which followed. Four other reputable doctors, testifying for defendant, somewhat reluctantly admitted this was correct. Consequently, we think this point is without merit. The motions for a directed verdict should be overruled.

As its second point, defendant insists that the policy of insurance does not "cover any liability of the physician for performing an operation without the consent of the patient". It is argued that this follows from a reasonable interpretation and application of the policy[4] provision reading:

"Assault and battery shall be deemed an accident within the meaning of this Policy unless committed by or at the direction of the insured."

Since we charged the jury that an operation, or other medical procedure, performed by a doctor without the patient's consent, constitutes "a technical battery or trespass" for which the former is liable,[5] and the jury found that Mrs. Shehee had not consented to the esophagoscopy, defendant contends that its assured has been found to have committed "an assault and battery", which was not an "accident"; therefore, that there is no coverage for this claim. It argues further, in support of this point, that inasmuch as we also charged the jury that, if they found there was no consent, they need go no further, for the physician in such a case is liable for all the consequences proximately resulting thereafter (even if no negligence, improper treatment or lack of skill is shown); and since the jury actually found a lack of consent, this is bound to have been the only ground upon which the general verdict was based.

We do not agree with either premise.

Considering them in inverse order, we carefully instructed the jury,[6]

---

3. Rule 49(b), Fed.Rules Civ.Proc., 28 U.S. C.A.

4. Actually, there were three policies, or certificates, discussed *infra*. All were issued by defendant. Only one, that in favor of the Green Clinic, contains the clause quoted.

5. This part of our charge was based upon Wall v. Brim, 5 Cir., 138 F.2d 478. See also 41 Am.Jur. 220, § 108, n. 8.

6. "The Court: Members of the Jury, as I told you in the beginning of my charge, it is for you, and you alone, to determine whether or not there is liabil-

immediately before they retired to deliberate, that they should consider all three grounds of alleged liability, not just the lack of consent question. While there may have been insufficient proof to support a verdict on the ground that the esophagoscopy was improperly performed, there was, as we have shown, ample evidence demonstrating dangerously incorrect post-operative treatment. Having made a general finding of liability, no one can say whether the jury based its verdict upon only one, upon two, or on all three points of alleged malpractice submitted to it for consideration. In our judgment, it would be highly unreasonable, as well as an unwarranted invasion of the jury's province, to conclude that its verdict was grounded wholly upon lack of consent. Rather, in view of our entire charge [7] and the practically undisputed evidence of negligent post-operative treatment, we think it far more likely that the jury found the doctors liable in both or all respects.

■ All three policies in evidence here provide general coverage " * * * against actual loss and/or expense arising or resulting from claims upon the as-

sured for damages on account of any *malpractice,* error or mistake * * *". (Emphasis supplied.) Defendant's counsel, in their brief, make a remarkable concession: "We readily concede that the word 'malpractice' has been almost universally construed by the courts to cover and include an operation performed without the consent of the patient. We, therefore, do not labor the point that the performance of the operation on Mrs. Shehee is included in the broad definition of malpractice." If counsel are correct in their concession, and they are,[8] coverage for "malpractice" definitely includes "lack of consent."

Defendant relies upon Moos v. U. S., D.C.Minn., 118 F.Supp. 275, 276, the only authority cited in support of its position. There suit was filed under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671–2680. By this legislation Congress partially waived the sovereign immunity of the United States from liability for certain torts. This waiver must be narrowly, strictly construed; and courts will not expand it.[9] The Act excludes liability for "assault and battery". In the cited case, following this rule of strict con-

---

ity in this case, that is whether or not the defendant is liable to the plaintiffs as is claimed by the plaintiffs. In submitting to you this interrogatory to be answered it covers only one of the three alleged grounds of liability claimed by the plaintiffs, *and we did not and do not mean to emphasize in your minds that this particular point is paramount and above the other grounds for your consideration. We would like for you to answer that question to the best of your ability* from the evidence that you have heard here, but after you have answered the question, and if you should answer it that Mrs. Shehee did consent to the performance of the esophagoscopy, and the Court is not suggesting to you to answer it one way or the other, either yes or no—that does not mean that you cannot find that there is liability on any other of the three grounds I have outlined to you. In other words, the answer to this question does not necessarily influence you, *and should not cause you to fail to give complete consideration to all three matters, or all three grounds, which were submitted to you.*

*In other words, even after answering the question you could find the defendant, if you think such finding correct, liable on either or both of the other two grounds. What I am trying to say is, that your answer to that question is not conclusive necessarily of your ultimate finding."* (Emphasis supplied.)

7. At the beginning we warned the jury: "If in these instructions any rule, discussion or idea be stated in varying ways, no emphasis thereon is intended by me and none must be inferred by you. For that reason you are not to single out any certain sentence or any individual point of instruction and ignore the others, but *you are to consider all of the instructions as a whole and to regard each in the light of the others."*

8. See 41 Am.Jur. 198, sec. 78, n. 7; Barnhoff v. Aldridge, 327 Mo. 767, 38 S.W.2d 1029, 74 A.L.R. 1252.

9. Spelar v. U. S., D.C.N.Y.1948, 75 F. Supp. 967; Bates v. U. S., D.C.Neb. 1948, 76 F.Supp. 57; Uarte v. U. S., D.C. Cal.1948, 7 F.R.D. 705, 1 A.L.R.2d 225.

struction, it was held that an unauthorized operation by Government surgeons constituted an "assault and battery" under Minnesota law, the *locus delicti;* therefore, that no recovery could be had under the Act.

In interpreting private insurance contracts, as distinguished from and in contrast with the limited immunity waiver situation present in the Moos case, the universal rule is that courts will give a liberal construction to policy provisions to effect coverage, where a narrow one would lead to manifest injustice.[10] An interpretation which entirely neutralizes one provision of the policy should not be adopted if the contract is susceptible of another which gives effect to all provisions and is consistent with the general intent. Seeming contradictions or conflicts should be harmonized if reasonably possible.[11] If terms of a policy are ambiguous, equivocal or uncertain, they are to be construed most strongly against the insurer, and in favor of providing the indemnity which is the dominant purpose of the policy. This is particularly true with regard to exclusions of coverage,[12] such as the clause under consideration.

Applying those principles to these private insurance contracts, we believe that a reasonable interpretation of the term "assault and battery", as used in the policy provision quoted, is that it means a willful or intentional, an unlawful or criminal, act of violence, not an incident such as we have here where, obviously, failure to obtain the patient's consent was due to inadvertence. As was stated, correctly, we think, in Hershey v. Peake, 115 Kan. 562, 223 P. 1113, 1114, "The fundamental distinction between assault and battery, on the one hand, and negligence such as would constitute malpractice, on the other, is that the former is *intentional* and the latter *unintentional.* 5 C.J. 625." (Emphasis supplied.) All doctors know they should have their patient's consent to an operation or render themselves liable, and no sensible practitioner would deliberately expose himself to such a risk.

In contracting for these policies, and paying premiums for them, the doctors surely expected to obtain coverage, among other things, against the very contingency here involved. Likewise, we believe defendant intended to cover them in that respect, for the "assault and battery" clause clearly was meant to exclude only acts of willful violence. This view is sustained, we think, by the fact that the same clause is contained in standard automobile liability policies, including those issued by defendant. Although the accidental striking of a pedestrian with a car is an example of a *technical* assault and battery, this clause is never invoked as an excuse to deny coverage in such cases, for the obvious reason that willful intent is lacking.

"An assault and battery is not negligence. The former is *intentional;* the latter is *unintentional.*" (Emphasis supplied.) 6 C.J.S., Assault and Battery, § 11, page 804. In this case failure to obtain the patient's consent was unintentional. It was a mere oversight. It did not constitute an "assault and battery". It was an act of malpractice, and, in our judgment, it was covered by the policies.

Again grasping at technicalities of coverage, not pleaded[13] and invoked for the first time in its brief on these motions, defendant points to another clause in one of its policies[14] which,

10. 29 Am.Jur. 172, verbo "Insurance", § 157.

11. Ibid., 176, verbo "Insurance", § 160.

12. Ibid., 183–184, verbo "Insurance", § 166.

13. Indeed, in Art. 5 of its answer, defendant admitted malpractice liability coverage for the Clinic and its individual partners.

14. This is a group policy, issued to the Louisiana Medical Society, with individual certificates in favor of Dr. Harms and Dr. Marvin Green, constituting them as assureds.

it says, is an exclusion of liability here. This clause reads:

"This agreement does not apply * * *

"(d) To the liability of the Assured as a member of a partnership or as proprietor, superintendent or executive officer of any hospital, sanitarium, dispensary or clinic."

Defendant insists that, since Drs. Harms and Marvin Green admittedly are members of a partnership—the Green Clinic—this policy does not cover them. To state this argument is to answer it: the exclusion simply applies to liability as *respondeat superior*, or *as a partner* for the malpractice *of another partner*, not the individual liability of a partner for malpractice committed by himself. Here there was strong evidence upon which the jury could have found, and evidently did find, personal liability on the part of Dr. Marvin Green for his own, individual malpractice in failing to obtain Mrs. Shehee's consent to the esophagoscopy, and in prescribing improper post-operative treatment. Likewise, there was evidence, though not so strong and perhaps insufficient legally because no medical expert testified for plaintiffs in that respect, upon which the jury could have found personal liability on the part of Dr. Harms for improperly performing the esophagoscopy. Again, this would have been an individual act of malpractice for which he would have been liable, by himself and not as a partner in the Clinic.

Which is to say, this exclusion of coverage is patently inapplicable here because liability under this policy attaches to defendant, not from the relationship of Drs. Harms and Marvin Green as partners—each responsible *pro tanto* for the wrongful acts of the other—but from the individual, personal liability of each for his own torts. The contention is utterly groundless. It should be overruled.

The remaining points in the motion for judgment n. o. v. are these:

1) That the suit was brought in the wrong venue, the Shreveport Division of this Court, instead of the Monroe Division, and 2) that the Court lacks jurisdiction because there is no diversity of citizenship between the real parties to the controversy, plaintiffs and the doctors all being citizens of Louisiana. The first is without merit because plaintiffs are citizens of Bienville Parish, in the Shreveport Division, and defendant is a corporate citizen of Connecticut. The suit thus meets the venue requirements of 28 U.S.C.A. § 1332, providing that diversity suits may be brought in the District where the plaintiffs *or* defendant reside. Exercising what we believe to have been a reasonable discretion,[15] we overruled defendant's motion to transfer the case, on the ground of *forum non conveniens*, to the Monroe Division, where the doctors reside. We perceive no error in this.

The last point is answered by Elbert v. Lumbermen's Mutual Cas. Co., 5 Cir., 201 F.2d 500, by which we are bound until and unless the Supreme Court reverses.

In all respects, therefore, and for the reasons given, we are convinced the motion for judgment notwithstanding the verdict should be, and it is hereby, overruled.

In its alternative motion, defendant asserts eleven grounds upon which it claims entitlement to a new trial. In its brief, however, it argues for only one: that the verdict is excessive, as having resulted from passion and prejudice. Therefore, we will consider here only that single ground, being satisfied that the others are without substance.

The special damages awarded to Dr. Shehee were proved to the penny. A short description of the intense suffering experienced by Mrs. Shehee clearly will demonstrate, we think, that the general damages awarded to her were not ex-

15. 28 U.S.C.A. § 1404.

cessive, certainly not to the point where they "shock the conscience".[16]

■ The esophagoscopy, in which the puncture occurred, was done on June 19, 1952. Immediately after leaving the operating room, she complained of severe pain in her chest. By the next day, this had become worse. X-rays having shown fluid in her chest cavity, it was determined that infection was present. She then was returned to the operating room where a large syringe needle was inserted through her left ribs into the mediastinum, a substantial quantity of infectious fluid being removed. A catheter, or small drainage tube, was left in the perforation.

A few days later she had come close to death from the infection in this vital area of her body. Repeated transfusions and infusions followed. By July 3rd, her condition had become so bad that a three-inch incision was made in the base of her neck, and then, with sharp and blunt instruments, a hole was opened downward behind her collar bone into her chest in order to reach a large abscess there, which was punctured. Much pus and infected tissue were removed, and catheters were left in the wound to effect continuous drainage.

On July 17th, since she still was no better, a six-inch incision was made in her back, just to the left of her spine. Portions of her eighth, ninth and tenth ribs were removed, and the wound was left open in order to drain the continually accumulating pus from the large abscess in her chest. Foul odors from this filled her hospital room. Particles of food worked their way out.

At this stage, and for some time afterward, Mrs. Shehee quite naturally became convinced she was dying with cancer. So sure of this was she, in spite of opiates and some delirium, that she gave instructions to her family for her funeral.

On July 25th, a ten-inch incision was made in her stomach, through which her esophagus was palpated to determine whether a stricture was present. Finding none, this wound was sutured, leaving a small opening for insertion of a tube into her stomach, and through this tube she was fed until late October.

She spent a total of fifty-six days in the hospital, with bills of nearly $4,000, none of which were for surgeon's or physician's services. Apparently, the doctors did not have the heart to charge for these services in view of what had happened.

Finally, in October, despite her deep and quite natural dread of the procedure, it was necessary for her to undergo another esophagoscopy at the Scott-White Clinic, Temple, Texas, to determine whether the puncture had healed. When this examination showed that it had, the stomach tube was removed.

In addition to the three large incisions and the additional esophagoscopy, Mrs. Shehee underwent nine comparatively minor operations. She also experienced many painful and discomforting incidents such as infusions, transfusions, constant nausea, a wracking cough, and a long time spent under an oxygen tent. She still suffers to some extent.

All things considered, we cannot and will not say this verdict is excessive. Rather, by all decent canons of human compassion, it appears to us to be on the conservative side, in the light of the most extensive suffering she endured. We are sure it does not demonstrate, nor have we detected, any passion or prejudice on the jury's part.

---

16. 15 Am.Jur. 622, § 205: "Since it is for the jury, and not for the court, to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing court would have awarded less. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained *do not shock the judicial conscience.*" (Emphasis supplied.)

This brings us finally to consideration of defendant's contention that its maximum coverage, or liability, under the policies it issued to the Clinic and doctors, is $50,000.

As stated, one policy (D–11) is in favor of the Green Clinic and its partners individually. Its limit of liability is $50,000. A second policy (D–12) is a group form, under which separate certificates were issued to Dr. Marvin Green (D–13) and to Dr. Harms (D–14), each of which specifies maximum liability limits of $50,000.

The Clinic policy, with reference to "Other Insurance", provides:

"If the insured has *other insurance* against a loss covered by this Policy the Company shall not be liable under this Policy *for a greater proportion of such loss than the applicable limit of liability* stated in the Declaration bears to the *total applicable limit of liability of all* valid and collectible *Insurance* against such loss." (Emphasis supplied.)

Put another way, this would read:

"With respect to liability under this Policy, if the Insured has other valid Insurance (either with this Company or others) covering any loss, this Company shall not be liable for a greater part of the loss than the ratio the maximum limit of liability under this Policy bears to the total limits of all such insurance."

Defendant has overlooked in its argument the key words emphasized in the following partial quotation from the "Other Insurance" clause, the quotation including in parentheses applicable added words and figures:

" * * * the Company shall not be liable * * * for a greater *proportion* (one-third) of *such loss* ($64,116.01) than the applicable limit * * * (of this policy—$50,000) * * * bears to the *total* applicable limit * * * of *all* ($150,000) * * * Insurance against such loss."

In other words, if "the Company" issues a policy with $50,000 limits, and two other companies issue policies to the same assured in like amounts, the total insurance provided by all is $150,000. The proportion of "the Company's" maximum limits under the Clinic policy to "all such Insurance" is one-third of the loss. The same is true as to the Group Policy. If "such loss" is for $75,000, "the Company's" limit of liability would be $25,000. Since the limiting clause simply refers to "other Insurance", and does not specify whether such should be in effect in "another company" or in the same company, we conclude that the same result follows in either situation.

The Group Policy, with respect to "Concurrent Insurance", in pertinent part reads as follows:

"If an Assured carry a Policy of another Insurer * * * against any loss * * * covered by this Policy, such Assured shall not recover from the Company *a larger proportion* of the *entire loss* * * * than the *amount hereby insured bears to the total amount* * * * of *Insurance* applicable thereto." (Emphasis supplied.)

This clause, we think, although couched in somewhat different language, is exactly to the same effect as the "Other Insurance" proviso of the Clinic policy.

Since there was a total of $150,000 in coverage provided by defendant in this case ($50,000 for the Clinic and/or each of its individual partners, plus $50,000 for Dr. Marvin Green under the Group Policy, plus $50,000 for Dr. Harms under the same policy), the ratio of each policy's limits to "all such Insurance" is one-third. Therefore, defendant is liable to plaintiffs under each policy or certificate for one-third of the verdict. If it were found legally that Dr. Harms is not liable to plaintiffs, due to insufficient proof of malpractice on his part, then Dr. Marvin Green alone had a total of $100,000 in coverage ($50,000 under the Clinic policy plus the same amount under the Group Policy). The ratio would be one-half,

and defendant is liable to plaintiffs under each policy for one-half of the verdict.

The practical effects are the same in either case. It matters not to plaintiffs or to this Court how defendant allocates its loss; adequate insurance exists to cover the entire verdict and judgment thereon.

Defendant cites Ranallo v. Hinman Bros. Construction Co., D.C., 49 F.Supp. 920, affirmed, Buckeye Union Casualty Co. v. Ranallo, 6 Cir., 135 F.2d 921, and Commercial Standard Insurance Co. v. American Employers Insurance Co., D.C., 108 F.Supp. 176, in support of its position. Without burdening this opinion, already too lengthy, with a detailed discussion of those decisions, it is sufficient to say that they actually accord with our views just expressed, and are authority against defendant's contention.

For the reasons given, the motion for a new trial must be, and is hereby, overruled.