Mrs. Clara H. HALL
v.
UNITED STATES of America.
Civ. A. No. 3282.

United States District Court
W. D. Louisiana, Shreveport Division.
Nov. 25, 1955.

189

John T. Campbell, Campbell & Campbell, Minden, La., Thomas W. Leigh, Theus, Grisham, Davis & Leigh, Monroe, La., for plaintiff.

T. Fitzhugh Wilson, U. S. Atty., Meredith T. Holt, Asst. U. S. Atty., Shreveport, La., for defendant.

**190**

DAWKINS, District Judge.

This is a suit against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2401, 2671 et seq. When the suit was filed, complainant was a resident of Jonesboro, Louisiana, within the Shreveport division of this court, and the proper venue. 28 U.S.C.A. § 1402 (b).

Complainant alleged she was the wife of a sergeant in the United States Army, whom she married in 1948, and in September, 1949, while they were stationed at Fort McPherson, Georgia, she became pregnant; that shortly thereafter her husband was hospitalized at Denver and with his parents she moved to East Chicago, Indiana, from which, in March, 1950, she was accepted at the United States Naval Hospital, Great Lakes Naval Training Center (operated by the Department of the Navy) as a military dependent for prenatal care; that on May 25, 1950, she was admitted to the hospital for delivery and her child was born the following morning at 3:14 o'clock; that she was given a spinal anesthetic, and when the needle was inserted, she felt a shock and sharp pains down both legs to her toes; that about noon of May 26 she felt a "heavy sensation" in both legs and was unable to use them; that the following day she had no control over her legs, lower back, bladder and bowels.

Further, complainant alleged she remained in the hospital continuously from May 25, 1950, through January 24, 1951, and that when this suit was filed on April 27, 1951, she was unable to walk without crutches and had not regained control of her bladder and bowels, all of which was caused by the spinal anesthetic. She further alleged that had the anesthetic been properly administered no injury would have resulted, and invoked the doctrine of "res ipsa loquitur." In the alternative, she alleged negligence in the following particulars: (a) that the needle was inserted so carelessly it came into contact with her spinal cord, or in such close proximity thereto as to produce paralysis; (b) that the person who administered the anesthetic either lacked the necessary skill, training or experience or failed to use it in the procedure; (c) that the defendant's agents failed in their duty to administer the anesthetic in such a manner as to avoid injury to complainant; (d) that defendant's agents failed to inform and warn complainant in advance of the possibility of disastrous results, if such be the case; and (e) that defendant's agents failed in their duty to use the safest methods known to medical science in anesthetizing complainant. She prayed for $100,000 in damages.

Respondent denied most of the allegations of complainant's personal history, for lack of information, but admitted her residence, prenatal care, admission to Great Lakes Naval Hospital, the administration of a spinal anesthetic, some difficulty with her legs and lower back and elimination system, and subsequent hospitalization. It further admitted operating the hospital in the treatment of complainant and other patients, and that the administration of drugs, medicines and anesthetics were at all times vested exclusively in the defendant, but specifically denied the applicability of "res ipsa loquitur." All allegations of negligence were categorically denied.

After preliminary motions and continuances, the case was finally tried partially on June 29 and 30, 1953, but was held open for the taking of depositions of unavailable witnesses and the filing of briefs. At the instance of complainant, the court brought the matter again to the attention of counsel, respondent's brief was filed October 4, 1955, and argument was heard on the 11th of that month.

At the trial, complainant introduced the testimony of herself and her mother-in-law with whom she was then residing, together with that of Dr. Boyce, a surgeon of Shreveport, and Dr. Walsworth, a surgeon of Monroe, as medical experts. Defendant produced as witnesses before the court Dr. Gomsi, the obstetrician, as to how he administered the

anesthetic to Mrs. Hall and delivered her child; Dr. Eddy, a surgeon practicing in Shreveport; and Dr. Jane Hickman, a Shreveport anesthesiologist who had formerly practiced in the Chicago area. It also introduced depositions by Dr. Harris, chief of the obstetrics and gynecology department at Great Lakes Hospital during the period involved here; Dr. Ocko, a neuro-psychiatrist who was called into consultation at Great Lakes on Mrs. Hall's case; Dr. Meyer Brown, another neuro-psychiatrist who examined complainant at Great Lakes and was a consultant on her case; Lieutenant Strohl, a nurse in the O. B. department at the hospital; and Seaman Elsner, a corpsman who was assisting in the delivery room at the time. The parties stipulated that Dr. Arnold, urologist consultant at the hospital who saw and treated Mrs. Hall, would testify in accordance with his written statement filed in the record by defendant. Also in the record are three articles from professional journals, as well as photostatic copies of all hospital records during the period of Mrs. Hall's confinement, and two other professional articles are attached to defendant's brief.

■ There is no dispute about the fact of the injury, nor is it necessary to determine whether defendant's agents and employees are responsible for all acts of a medical nature performed for Mrs. Hall during her hospitalization. Neither is there any question of contributory negligence on the part of Mrs. Hall, for no such claim was raised or even suggested in the pleadings or the evidence. We may further narrow the scope of our inquiry by observing that all medical experts who testified on the subject are unanimous in the opinion that Mrs. Hall's condition was caused by the spinal anesthetic, and the Court so finds.

The events charged in the complaint and discussed in the testimony relate to the period from Mrs. Hall's admission to the hospital on May 25, 1950, through the delivery and into what might be termed the diagnostic period of postoperative treatment after her paralysis had been discovered. Issues are raised with respect to three general factual situations, and for convenience of statement they will be discussed separately. They are: (1) was there negligence in deciding to use a spinal anesthetic and in failing to inform Mrs. Hall of any danger inherent in its use? (2) was there negligence in the administration of the anesthetic? and (3) was there negligence in failing to take prompt and proper steps in diagnosing her ailment when the paralysis was discovered and in prescribing treatment therefor?

### I.

As will be discussed in detail later, it is the position of the defendant that for reasons unknown and unforeseeable, a small percentage of persons have a sensitivity to the drugs used in spinal anesthesia and occasionally serious after effects follow; and on relatively rare occasions, death results. Complainant contends that if this be true, there was a duty upon defendant's agents to use a safer method, or at least to warn her of the possibility of injury and obtain her consent.

In that connection complainant testified that she placed herself completely in the hands of the personnel at the hospital and relied upon their best judgment; that at no time did anyone discuss with her the type of treatment or anesthetic which might be given her.[1] Dr. Gomsi stated that it was his usual practice to discuss with his patients the general physical condition, the adequacy of the pelvis, the general technique in preparing for delivery, the decision as to

---

1. She stated a fellow patient had told her prior to the delivery that she (the other patient) had received a spinal anesthetic over her objection because "everybody else was taking them and she had to take it too." On the basis of this information, Mrs. Hall said she never discussed the matter with any hospital personnel.

anesthetic and the type of delivery anticipated. He did not specifically remember discussing the anesthetic with Mrs. Hall, but he had discussed his choice of a spinal with Dr. Harris, chief of the department, who had approved the decision.

According to Dr. Gomsi, and his testimony is corroborated by all the experts who discussed these points, there is an unpredictable degree of danger in the administration of any anesthetic,[2] and unless there are contra-indications, spinal anesthesia is preferable for childbirth because it allows the patient to remain conscious and assist in the delivery.[3] He further testified that he found no contra-indications in Mrs. Hall to any anesthetic and his understanding of what conditions or facts constitute contra-indications is in substantial accord with the other expert testimony on the subject.

▮▮ Upon this evidence, I find that in so far as this record is concerned, the spinal anesthetic was preferable in Mrs. Hall's case and that there was nothing to indicate that it was unsafe or less safe than some other type. However, the Court is convinced, and so finds, that the problem of anesthesia was not discussed with Mrs. Hall, nor was she warned of any possible after effects, nor was there any specific consent by her to the use of a spinal.[4] We now turn to the question of whether or not this was negligence.

▮ The case is controlled by the law of Illinois, where the alleged negligence occurred. 28 U.S.C.A. § 1346(b). The Court has found no Illinois cases dealing with the administration of anesthetics, nor does plaintiff cite any Illinois authorities for her contention on this point. In 41 Am.Jur. 212, it is said that the rules relating to the duty and liability of a physician in administering anesthetics are substantially the same as those which govern him in treating a patient generally and that with respect to that procedure he is bound to possess and use the same degree of knowledge and skill to which he is ordinarily held. 70 C.J.S., Physicians and Surgeons, § 41, p. 949 is in substantial accord with this statement of the general rule. In Pratt v. Davis, 224 Ill. 300, 79 N.E. 562, 7 L.R.A.,N.S., 609, it was held that ordinarily a surgeon must obtain the consent of his patient before performing an operation, the surgeon there having been held liable for the removal of a patient's uterus after discussing a relatively minor procedure. It has also been said that this same requirement of consent exists with respect to any medical procedure. 41 Am.Jur. 220–221; Shehee v. Aetna Casualty & Surety Co., D. C.La., 122 F.Supp. 1.

This consent need not be specific or express in all cases, but is sometimes implied from the circumstances, such as voluntary submission to an operation or procedure. 41 Am.Jur. 221; 70 C.J.S. Physicians and Surgeons, § 48, pp. 967–968. However, the same authorities cite illustrations of situations in which an implied consent may not be successfully

---

2. It is the consensus of the medical opinion in this case that all drugs used to induce anesthesia are toxic and that some individuals have unusual sensitivity to one or another of these drugs. So far as this record shows, there is no known method or procedure for determining this sensitivity in advance. It further appears that most patients suffer nausea when anesthetized by any method, and there is additional danger of suffocation under general anesthetic.

3. The experts testified that a spinal anesthetic (or saddle block) renders an obstetrical patient insensible to pain in the pelvic region, but does not materially interfere with uterine contractions and enables the patient to assist in the delivery by "pushing". General anesthesia renders the patient unconscious, and local anesthesia slows down muscular activity considerably.

4. There was some discussion during the trial of a waiver thought to have been signed by Mrs. Hall upon her admission to the hospital. However, no such waiver was ever produced, and Mrs. Hall denied having signed one. I therefore find that none was signed.

contended because of misunderstanding or misrepresentation. Pratt v. Davis, supra, was such a case.

 Applying these principles to the instant case, the Court finds that Mrs. Hall impliedly consented to the administration of the anesthetic. She entered the hospital for the express purpose of being delivered of her child; the birth of the child was imminent, pre-ordained by nature, and its delivery was not a matter involving diagnosis and choice in the usual sense. It is common knowledge that a mother suffers intense pain during childbirth, and the use of anesthetic of some form is now standard procedure, expected by the patient. That Mrs. Hall herself knew of the use of anesthetic in the delivery procedure and expected a spinal is evidenced by her own testimony as paraphrased in footnote 1, supra.

 In the light of these observations, plaintiff's position on this point is interpreted to be that the failure of defendant's agents to warn Mrs. Hall of the dangerous propensities of the spinal anesthetic deprived her of the knowledge upon which to base an intelligent decision and vitiates her implied consent. See Pratt v. Davis, supra. However, as has been stated, the evidence clearly shows that all anesthetic drugs are inherently dangerous to some degree[5] and that in the absence of contra-indications the spinal affords certain advantages over other types for use in childbirth. There was nothing in Mrs. Hall's history to cause undue apprehension of injury from a spinal anesthetic. Moreover, all experts, even plaintiff's own witnesses, testified that most patients are in a state of high nervous tension and anxiety when preparing for such a procedure and that it would be very bad practice voluntarily to warn such a patient that she might die or become paralyzed as a result of

receiving anesthetic. They all agree that a doctor should discuss the matter in detail if asked by the patient, but that he should not volunteer such information.

In view of the testimony here to the effect that results such as Mrs. Hall's case are not expected nor probable, and considering the absence of Illinois law to the contrary, I hold that there was no duty upon defendant's agents *in this case* to warn Mrs. Hall of *possible* consequences or to obtain her specific consent to a spinal anesthetic. It follows that their failure to do so was not negligence and cannot form the basis of recovery here.

## II.

 In Illinois, a physician or surgeon is bound to possess and use "reasonable skill—not, perhaps, the highest degree of skill that one learned in the profession may acquire, but reasonable skill such as physicians in good practice ordinarily use and would bring to a similar case in that locality." Schireson v. Walsh, 354 Ill. 40, 187 N.E. 921, 927. See also Holden v. Stein, 312 Ill.App. 260, 38 N.E.2d 378; Simon v. Kaplan, 321 Ill.App. 203, 52 N.E.2d 832; Church v. Adler, 350 Ill.App. 471, 113 N.E.2d 327; Lucas v. Hambrecht, 1 Ill. App.2d 226, 117 N.E.2d 306. These cases indicate that Illinois follows the general rule, including the requirement of knowledge or training and due care in the exercise of the skill and knowledge. 41 Am.Jur. 200; 70 C.J.S., Physicians and Surgeons, § 41, p. 947. In malpractice actions in Illinois, the burden is on the plaintiff to prove by affirmative evidence that the defendant was unskilled and negligent, Lucarelli v. Winters, 320 Ill.App. 359, 51 N.E.2d 205; Simon v. Kaplan, supra; Lucas v. Hambrecht, supra; Wade v. Ravenswood Hospital Assn., 3 Ill.App.2d 102, 120 N.E.2d 345; but in situations to

---

5. "A physician or dentist in administering an anesthetic is only bound to look to natural and probable effects, and is not answerable for results arising from the peculiar condition or temperament of a patient, of which he had no knowledge." 70 C.J.S., Physicians and Surgeons, § 41, p. 949.

which the doctrine of res ipsa loquitur applies, the plaintiff is entitled to the assistance of that doctrine in sustaining the burden of proof.

While there is considerable divergence of opinion as to the true meaning and actual effect of the doctrine of res ipsa loquitur,[6] courts are in general agreement in stating the prerequisites for its applicability, and Illinois follows the general rule. One of the leading cases is Feldman v. Chicago Rys. Co., 289 Ill. 25, 124 N.E. 334, 6 A.L.R. 1291, in which the court stated: "When a thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from the want of proper care." 124 N.E. 338. See also: Bollenbach v. Bloomenthal, 341 Ill. 539, 173 N.E. 670; Simon v. Kaplan, supra; McCleod v. Nel-Co Corp., 350 Ill.App. 216, 112 N.E. 2d 501.

First, it is necessary to determine whether or not the doctrine of res ipsa loquitur is applicable here. It is admitted that defendant's agents had exclusive control and management over the devices and substances used and over the procedure; the question is whether the result was such "as in the ordinary course of things" would not have occurred had defendant's agents used the requisite skill and care. A proper solution to this inquiry must be based upon an analysis of that result.

Both Dr. Boyce and Dr. Walsworth, plaintiff's witnesses, had examined her shortly before the trial. Dr. Boyce stated that the condition he found could not have resulted unless "something improper happened somewhere." Elaborating, he said he tested Mrs. Hall's patella reflexes and found them present and pronounced. He therefore diagnosed Mrs. Hall's condition as a "partial *spastic* paralysis from the waist down, including bladder and bowels" (emphasis supplied), caused either by injury from the needle or the toxic effect of some foreign substance in the anesthetic. He thought the latter to be more likely and stated that the contaminant could have come only from the sterilizing solution in which the anesthetic drug was stored. Under cross examination he admitted that he had heard and read of a condition known as "cauda equina syndrome"[7] resulting from properly administered spinal anesthetic; however, he was of the opinion that the permanency of the symptoms and presence of *spastic* paralysis ruled out a cauda equina syndrome and indicated deterioration of the lower portion of the spinal .cord itself, which could have resulted only from needle trauma or chemical damage from a highly toxic foreign substance.

Dr. Walsworth did not mention the spasticity observed by Dr. Boyce, nor did he discuss the cauda equina syndrome as such. However, he did attach significance to the permanency of the symptoms, and he thought they indicated a destructive lesion either of a minute area of the cord or of the nerves of the sacroperineal area. He had never heard or read of a similar case, and he could not believe that the condition resulted merely from sensitivity to the drug. He was of the opinion that the result could have been caused only by an

---

6. See Shain, "Res Ipsa Loquitur—Presumptions and Burden of Proof" 1945, Parker & Company.

7. Medical witnesses explained that the spinal cord terminates in the region of the first lumbar vertebra and that the sacral nerves, of some length, extend downward therefrom in a bundle resembling a horse's tail. The anesthetic drug is normally injected into the "cauda equina". "Syndrome" is used to describe a collection of symptoms. Thus, a "cauda equina syndrome" is that specific group of symptoms which, to the medical mind, reflects damage to or malfunction of the sacral nerves in the cauda equina.

error or failure in the administration of the anesthetic.

For reasons not explained, none of defendant's medical witnesses had examined Mrs. Hall since her release from the hospital some twenty-nine months prior to the trial. Those who had been active in her case relied upon their earlier examinations and the hospital records. Those who had not attended her personally relied upon the hospital records and the reports by attending physicians written when she was discharged. The failure of defendant to present testimony based upon an up-to-date examination has forced the Court to spend a great amount of time in comparing the voluminous testimony of the medical witnesses. In doing so I find that the only material point of difference between the actual findings and diagnoses of plaintiff's witnesses and those of defendant is the evidence of spasticity mentioned by Dr. Boyce.

Mrs. Hall stated that except for some degree of recovery from, or compensation for, loss of bladder control, her condition at the time of the trial was substantially the same as when she was released from the hospital, although on cross examination she stated that the condition of her legs had improved to the extent that she had been able to discard the braces with which she had been fitted at the hospital. Of course, being a lay witness, she did not give testimony as to the presence or absence of reflexes either during her hospitalization or afterwards.

Dr. Eddy, testifying as defendant's witness, stated that he had not personally examined Mrs. Hall, but that the knowledge of spasticity [8] would not necessarily change his diagnosis. He would be unable to associate true spastic paralysis with the other recorded symptoms, particularly the loss of sphincter control. He did testify that in lower motor neuron paralysis there may be occasional evidences of spasticity caused by pain or contractions, but that the paralysis would be considered flaccid because of the diminished reflexes. He stated that all other symptoms had to be considered and that his diagnosis or opinion did not depend upon the characterization of the paralysis as spastic or flaccid.

Dr. Ocko was a neuro-psychiatrist on the staff at Great Lakes and was called in to examine Mrs. Hall on May 27, 1950. He found parenthesia from the pelvis down, absence of superficial reflexes, marked weakness of the right patella reflex, and complete absence of the left patella and both achilles reflexes. He found no loss of pain or touch sensation in the extremities, but the sacral area was completely anesthetic. There was no sphincter control of bladder or bowel. He treated plaintiff regularly from that date until her discharge the following January. Under cross examination, he traced the progress of Mrs. Hall's case in considerable detail, and his evidence shows continuous and marked improvement. By the time of her discharge, he said, all of Mrs. Hall's deep reflexes had returned, and there was good function at both knees and the right ankle and foot. Neurologically, there was only a "foot drop" condition of the left foot and some loss of sensation in the sacral area when she left the hospital; and, Dr. Ocko believed that she had progressed almost to maximum improvement. He diagnosed the injury as chemi-toxic reaction to the spinal anesthetic, which left some scar tissue on the nerves of the sacral region and would result in a degree of residual paralysis. He said that total recovery does not necessarily follow such an injury if there were sufficient scar tissue to involve the nerves permanently.

Dr. Ocko's testimony was corroborated by that of Dr. Brown, a civilian

8. The testimony shows that the presence of reflexes in a paralyzed person is sometimes evidence of spasticity. It seems to be agreed that true spasticity indicates a brain lesion or damage to or above the spinal cord, while paralysis resulting from damage to the lower section of the central nervous system is usually flaccid.

neurologist employed as a consultant at Great Lakes, who had examined Mrs. Hall and assisted in her treatment. Significantly, he noted the absence of reflexes in the beginning of her difficulty but showed their return and the marked improvement in her condition. He was definite in his opinion that the injury probably resulted from an idiosyncrasy to the anesthetic drug. He also corroborated Dr. Ocko's opinion that permanent damage can be done by scar tissue in such cases, and said he encountered complications of this severity two or three times a year.

Dr. Arnold, the urologist who treated Mrs. Hall at the hospital, stated in his final report that at the time of her discharge her urinary system was functioning normally in every respect. His summary also records marked recovery of reflexes and sensory control and is therefore corroborative of other testimony for defendant. It should also be noted that under cross examination, Mrs. Hall generally admitted the improvement noted, particularly with respect to bladder control and the partial return to use of her extremities.

■ This evidence forces the Court to the conclusion that the differences in the actual findings of Dr. Boyce for plaintiff and those of defendant's experts are more apparent than real. It is evident that Mrs. Hall's reflexes were indeed absent or considerably impaired in the beginning, but that the treatment given her had restored them by the time she was examined by Dr. Boyce. The Court is therefore convinced that her original paralysis was flaccid, and that the presence of reflexes nearly three years later is not significant, or certainly not determinative, in the diagnosis of her ailment. Without further recitation thereof, the heavy preponderance of the evidence leads the Court to find that Mrs. Hall is suffering from the after effects of "cauda equina syndrome" which might have resulted from any one of four causes: (1) infection; (2) needle trauma; (3) chemical trauma from a contaminant in the anesthetic; or (4) an idiosyncrasy or natural sensitivity to the drug. Only the possibility of infection and needle trauma have been ruled out by the general evidence as to the cause, including the medical literature; and the Court finds that the plaintiff has not borne the burden of proving that such a result does not occur in the ordinary course of events without negligence. It follows that the doctrine of res ipsa loquitur is not applicable to this case.

■ We must now consider the specific charges of negligence. Before proceeding directly into a discussion of the specific procedure followed in the delivery room, it is necessary to deal briefly with two factual issues raised. The complaint alleges lack of the required skill and knowledge on the part of the persons who administered the anesthetic, but most medical experts, including one of Mrs. Hall's witnesses, stated that the training and background recited by Dr. Gomsi fully qualified him to administer the drug. In fact, Dr. Hickman testified that in view of the situation prevailing in Chicago at the time, Dr. Gomsi was probably more qualified than many persons administering spinals there. I therefore find that Dr. Gomsi did possess the requisite skill and training.

■ Counsel for plaintiff questioned the wisdom of Dr. Gomsi's administering the anesthetic himself when there was an anesthesiologist on duty at the hospital. However, the clear preponderance of the expert testimony again supports Dr. Gomsi's actions. Several of defendant's witnesses testified that it is the usual procedure for the surgeon or obstetrician to administer the anesthetic himself, and Dr. Walsworth, one of plaintiff's witnesses, stated he always administered the spinal during an operation he was performing whether or not an anesthesiologist was present. I find there was no deviation from the standard in this respect.

Dr. Gomsi recited in minute detail, and step by step, the exact procedure he followed in preparing for and administering the anesthetic, which was pontocaine in a solution of ten percent glucose. His account was corroborated by Corpsman Elsner, his assistant during the procedure. As might be expected, it is the only testimony relating to what actually happened in the delivery room, since plaintiff was without knowledge on the subject and no one else was present, when the anesthetic was administered. Without recounting Dr. Gomsi's description of what he did, it is sufficient to state that all medical experts testified generally that the drug used and the general procedure recited were recognized and considered standard throughout the medical profession, in the Chicago area and elsewhere. Questions are raised only as to specific details of the procedure.

The first of these may be resolved briefly. In recounting the details of the administration of the spinal, Dr. Gomsi stated that he inserted the needle directly into the dural sac at the third lumbar interspace, passing it between the vertebrae on the first attempt without touching bone. Dr. Walsworth, testifying for plaintiff, considered this poor procedure and dangerous. It was his view that the position of the needle must be confirmed by contact with the bone and then slipped off the edge of the bone into the cauda equina. However, every other expert who testified on this point, including Dr. Boyce for plaintiff, stated that the needle should be inserted directly into the dural sac as Dr. Gomsi did. Dr. Eddy and Dr. Hickman went further to say that the bone should be avoided because of the danger of damaging it or interfering with the insertion. With the record in this state, the most that can be said for plaintiff's contention on this point is that it represents one of two schools of professional thought. I find from the preponderance of the evidence that Dr. Gomsi's procedure conformed to the accepted standard in this respect.

The other complaint as to the procedure is more substantial, and concerns the storage of the substances used in the anesthetic. The testimony reveals that pontocaine is a dry crystallized substance packaged by the manufacturer in sealed sterile glass ampules. When opened for use, it should be completely dry and should shake around in the ampule in flaky crystal form. The glucose solvent is a clear colorless liquid packaged in the same type of ampules. Dr. Gomsi and Corpsman Elsner stated that at Great Lakes two ampules, one of each substance, were bound together with a rubber band and placed in a container of Bard-Parker solution for antiseptic storage until needed. The ampules used in Mrs. Hall's case were removed from a container of Bard-Parker which had not been artificially colored. Corpsman Elsner stated it was naturally amber in color and Dr. Gomsi called it "dark yellow".

In developing the opinions of her expert witnesses that her condition resulted from injection of a foreign substance which could have come only from the storage solution, plaintiff presented testimony that it is possible for the glass ampules to be cracked in handling to an extent that the storage solution could seep in and contaminate the contents. There is testimony to the effect that such cracks are sometimes so minute as to be invisible to the naked eye and also that it is considered possible for a degree of contamination to occur without reaction on the contents visible upon casual examination. Further, at least two of the articles in evidence recognize that there is danger of such contamination and recommend the addition of darkly colored dye to the storage solution, it being suggested that this precaution will render any seepage readily discoverable.

Admittedly, Great Lakes Hospital did not artificially color the Bard-Parker solution in which the ampules were stored; and the record discloses that one of the principal ingredients of this solution is formaldehyde, a substance known

to be destructive of nerve cells. Accordingly, plaintiff takes the position that the failure of defendant's agents to color the Bard-Parker solution was negligence which entitles her to recovery for her injuries.

■ The Court is persuaded on this record that the practice of artificially coloring the storage solution is certainly the safer procedure, and that it was a known and generally followed practice in the Chicago area when Mrs. Hall was injured in 1950.[9] However, I cannot conclude that the failure to follow this practice in Mrs. Hall's case was the cause or the most probable cause of her injury. Dr. Gomsi and Corpsman Elsner both stated they carefully examined the two ampules used here, finding the pontocaine dry and loose and the glucose clear and colorless. Plaintiff's experts indicated that if storage solution seeped into an ampule of pontocaine, the drug would become caked or at least moist enough to prevent it from shaking around in the ampule as it should. There is testimony by Dr. Eddy and Dr. Hickman that they had placed a small drop of Bard-Parker solution in an ampule of glucose and discovered that the glucose became cloudy or milky to an extent readily visible at a glance. Further, defendant's experts questioned on the point were doubtful that so small an amount of Bard-Parker solution could cause the permanent damage done to Mrs. Hall because of the degree of its dilution; and this view is strongly supported by an experiment recounted in one of the articles introduced in evidence. There the workers injected unadulterated storage solution containing ten percent formaldehyde directly into the spine of a dog and recorded that within eighteen hours all abnormalities had disappeared.

■ All this evidence renders highly speculative the conclusion that the ingredients of the anesthetic used in this case were contaminated by seepage of the Bard-Parker solution. In addition, the Court is again faced with the great preponderance of evidence that the conditions resulting in Mrs. Hall's case could have been, and most probably were, caused by hypersensitivity on her part to the drug used for the spinal.

### III.

■ There is no direct testimony in behalf of plaintiff upon which a contention of improper post-operative diagnosis and treatment can be based. The hospital records, however, reflect that the physicians on the staff at Great Lakes were at first uncertain of the nature of Mrs. Hall's ailment, several possible diagnoses being postulated in the record entries. Without reciting the evidence in detail, it is sufficient to state that measures were taken to afford treatment for the conditions which would be present if either of the possible diagnoses were correct. Eventually, all attending physicians agreed upon the diagnosis previously discussed and a definite course of treatment was prescribed. It is evident that Mrs. Hall had the benefit of the knowledge of specialists in each phase of medicine involved in her case, including a civilian specialist, and the record itself is ample proof that remarkable results were achieved. By implication in cross examination, counsel for plaintiff emphasized the failure of defendant's agents to "tap" her spine after the accident to obtain fluid for diagnostic purposes. However, this point is not seriously urged in argument; and the Court finds from the expert testimony that such a diagnostic procedure would not have been of appreciable assistance. Further, the success of the treatment prescribed furnishes evidence of the accuracy of the diagnosis. This being the only issue as to post-operative procedure, I find

9. The literature on the subject is dated prior to 1950; and Dr. Hickman, defendant's witness, stated that this was the usual procedure in Chicago when she left there in 1946. However, it appears that even at the time of the trial (1953) some hospitals declined to follow this practice for reasons not explained.

there was no negligence on the part of defendant's agents in this respect.

Any person of normal sensibilities must be deeply concerned over a tragedy such as that disclosed by this record and must feel the utmost sympathy for Mrs. Hall. Yet, however remarkable the advances made by medical science, there remains much to be learned; and members of the medical profession cannot be held responsible for circumstances beyond their knowledge and ability as human beings to anticipate and prevent. Accordingly, the law wisely requires of them only that they possess and use the reasonable knowledge, ability and skill of their colleagues. I find from the preponderance of the evidence that defendant's agents complied with the legal standards in this case. Appropriate decree will be signed.