Frank E. SCOTT, Appellant,

v.

Anthony WILSON, Appellee.

No. 14417.

Court of Civil Appeals of Texas.

San Antonio.

Nov. 3, 1965.

Rehearing Denied Dec. 1, 1965.

Earle Cobb, Jr., San Antonio, for appellant.

Groce, Hebdon, Fahey & Smith, Thomas H. Sharp, Jr., San Antonio, for appellee.

MURRAY, Chief Justice.

This suit was instituted by Frank E. Scott against Dr. Anthony Wilson for malpractice in performing, on his left ear, an operation known as stapedectomy with vein graft. The trial began to a jury, but when Scott rested his case the trial court gave an instructed verdict that plaintiff take nothing, and Scott has prosecuted this appeal.

The main question presented in this case is whether Dr. Wilson reasonably and adequately informed Scott of the dangers and hazards to be anticipated from the stapedectomy operation so as to prepare him to give a knowledgeable consent to the operation.

This was not an emergency operation which had to be performed to preserve Scott's life or health. Scott was not unconscious at the time so as to be unable to give consent. Such operation was an elective operation which Scott might decide to have or not to have. He had impaired hearing in his left ear, but was able to improve his hearing by the use of a hearing aid. He could choose to have the operation or to continue with the use of his hearing aid.

■ Under such circumstances, when Scott went to Dr. Wilson to discuss the operation, it was the doctor's duty to inform him of the nature of the operation, the processes contemplated, and the dangers and hazards of the operation and the chances of restored hearing, so as to enable Scott to determine whether he wanted to risk the operation or to live with his impaired hearing. The doctor was under a duty to make full disclosure of these things and not to minimize them. He should not mislead anyone as to his skill and ability to perform the operation.

In some respects Scott and Dr. Wilson agree as to what was said and done on the occasion of their conference, and in some respects they disagree. Scott says that when he called at Dr. Wilson's office on the occasion in question Dr. Wilson gave him an examination covering some forty-five minutes. The doctor went over the nature of the operation with him and apparently explained it fully. This seemed to be good and well, but Scott says that the doctor misled him when he said that with an ideal patient like him "we" have 90% success and 10% in which the hearing is not improved or made worse. The doctor says that he went further and said in 1% the hearing is entirely lost. Scott says that he was not told about the one percent. This is important because Scott entirely lost the hearing in his left ear. Scott says that by the use of the word "we" he understood that the doctor had performed the stapedectomy operation before, while in truth and in fact this was the doctor's first stapedectomy operation.

Scott says he further told him the operation would be performed at the Baptist Hospital because he had his equipment and a trained crew there. Scott says this caused him to further believe the doctor was experienced in performing this operation. Scott states he asked the doctor what the risk of disability was, and was told there was no risk other than that always connected with anesthetics. It is possible that Scott had one thing in mind and the doctor another. Scott says the operation was a failure and resulted in (1) the complete loss of hearing in the left ear, (2) tinnitus, (3) recurring periods of vertigo, (4) recurring dizziness and loss of balance, (5) loss of taste, (6) other nervous disorders. When the doctor, while on the witness stand, was asked what bad effects a patient might have as a result of the stapedectomy, he replied: "Well, he can lose his hearing; he can get meningitis; he can die. * * * Everyone has vertigo following this operation, temporarily. * * * some people get tinnitus. * * * In elderly individuals this (instability or a dizziness) is an occasional occurrence." The doctor stated he knew these things when he operated on Scott. He further testified that he probably told Scott about the taste problem, Scott says he might have.

The evidence shows that the doctor was by education, training and experience a very skillful ear surgeon, and had performed many ear operations other than stapedectomy. He had studied the operation under some of the best authorities and had performed the operation some ten or fifteen times upon cadavers, but never before upon a live person.

The above statement is not complete in every respect, but we feel it is sufficient to show the situation at the time the trial court gave the defendant below an instructed verdict in his favor.

█ There was a fact issue raised here upon conflicting testimony as to whether Dr. Wilson made a full disclosure of the risk, dangers and outcome probabilities of the stapedectomy operation, and therefore the trial court should not have granted the instructed verdict in appellee's favor. We find no authorities in this State directly in point, but there are authorities from other jurisdictions that are in point. Bowers v. Talmage (Bowers v. von Storch), Fla.App., 159 So.2d 888, wherein it is held that where there is no emergency the doctor is under a duty to adequately inform the patient as to the dangers to be anticipated as a result of the operation, and not to minimize them. Whether the doctor complied with that duty was there a question for jury determination.

In Russell v. Harwick, Fla.App., 166 So. 2d 904, the Court held that the doctor was negligent in failing to inform the patient as to the alternate methods of surgical treatment he contemplated, and in proceeding without the informed consent of the plaintiff.

In the very recent case of DiRosse v. Wein, 24 A.D.2d 510, 261 N.Y.S.2d 623, the Court said: "We are of the opinion that, under the facts and circumstances disclosed by this record, including the fact that no immediate emergency existed, defendant was obligated to make a reasonable disclosure to his patient of the known dangers which were incident to or possible in the proposed use of gold; and that the trial court, therefore, did not err in charging, in substance, that defendant could be found guilty of malpractice if he failed in that duty (cf. Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, rehearing denied 187 Kan. 186, 354 P.2d 670; Mitchell v. Robinson, 334 S.W.2d 11 [Missouri])."

In Mitchell v. Robinson, Mo., 334 S.W.2d 11, the Supreme Court of Missouri said: "In the particular circumstances of this record, considering the nature of Mitchell's illness and this rather new and radical procedure with its rather high incidence of serious and permanent injuries not connected with the illness, the doctors owed their patient in possession of his faculties the duty to inform him generally of the possible serious collateral hazards; and in the

detailed circumstances there was a submissible fact issue of whether the doctors were negligent in failing to inform him of the dangers of shock therapy."

While Dr. Wilson was on the witness stand he was asked the following questions and gave the following answers relating to the stapedectomy operation, to-wit:

"Q. All right. I'll read further, 'This type of surgery is not for the impatient surgeon or for the otologist with the occasional opportunity to perform this surgery.' Do you agree with that?

A. Yes.

Q. Further down he says, 'Never before have so many patients with otosclerosis been willing to accept the procedures that we are offering them today to improve their hearing. The unprecedented publicity regarding this operation in newspapers, magazines, radio, and television has left an impression in the minds of most people that the operation is infallible. The public has been educated to believe that modern science and ingenuity have solved their ills, and without risk. They need not be discouraged from assuming this risk, but they certainly should be aware of it.' Do you agree with that?

A. Absolutely.

Q. Is that your opinion?

A. Yes."

There can be no doubt that the stapedectomy operation performed on Scott was an elective operation and performed under such circumstances as to require of Dr. Wilson that he reasonably and adequately warn Scott of the known hazards and dangers that might probably be expected from such an operation, and the chances of favorable and unfavorable results to be contemplated.

The consent which Scott gave to have the operation performed is of no effect unless it was an informed and knowledgeable consent. There is no question here as to Scott's being injured and suffering damages as a result of the operation.

If Dr. Wilson did not have Scott's informed consent to operate upon him he would be guilty of assault and battery on Scott, and liable for the damages caused by the operation. Moss v. Rishworth, Tex. Com.App., 222 S.W. 225.

The court did not err in excluding the testimony of Meredith Mallory, Jr., because he failed to qualify as a medical expert.

The judgment of the trial court is reversed and the cause remanded for a new trial.

BARROW, J., not sitting.