**Xenia D. BELL, Appellant,**

v.

**Robert G. UMSTATTD, Appellee.**

**No. 11378.**

Court of Civil Appeals of Texas.

Austin.

March 30, 1966.

Martin J. DeStefano, Austin, for appellant.

Brown, Sparks & Erwin, Jay H. Brown, Will G. Barber, Austin, for appellee.

PHILLIPS, Justice.

This is a suit for damages brought by Xenia Bell, the appellant here, against Robert G. Umstattd, an anesthesiologist and appellee, for injuries sustained by appellant as a result of appellee's attempts to insert an endotracheal tube between her vocal cords in order to administer an anesthetic prior to surgery. When appellant rested her case in the trial court, appellee made a motion for an instructed verdict upon the grounds that no competent evidence of any probative force was presented upon which any findings of negligence or proximate cause could be based. The trial court granted this motion and appellant has perfected her appeal to this Court from a take nothing judgment.

We affirm the judgment of the trial court.

On or about March 1, 1962, appellant contacted Dr. John Garcia concerning a mass or swelling in her abdomen. Dr. Garcia then engaged Dr. Maurice Hood to examine appellant. Said examination revealed a pulsating mass, and it was decided by said doctors to perform an exploratory laparotomy to determine the nature of the pulsating mass. An operation was scheduled for March 13, 1962, to perform this surgery. Appellee, Dr. Robert Umstattd, was engaged on behalf of appellant by Dr. Maurice Hood to administer the anesthetic to appellant while undergoing the operation. Appellee decided to administer the anesthetic gases by use of an endotracheal tube, a method wherein a plastic tube is inserted between a patient's vocal cords. After the tube is inserted it is connected to an anesthesia machine which administers the gases selected by the anesthesiologist. Following said operation on March 13, 1962, appellant's vocal cords were endemous and swollen. Two granulomas were caused to be formed on appellant's vocal cords and an adhesion developed at the anterior intersection of appellant's vocal cords and a web formed.

Following the operation on March 13, 1962, appellant was sent to the intensive care unit of Brackenridge Hospital because of fear that her vocal cords would swell

shut and that she might die of suffocation. She remained in an oxygen tent in the intensive care unit from March 14 to March 16, 1962. A tracheotomy kit to perform a tracheotomy, a method wherein a patient's throat is slit to provide an airway, was kept available during appellant's stay in the intensive care unit.

Dr. Oliver Suehs was contacted following the surgery to examine appellant's vocal cords. On or about April 12, 1962, surgery was performed on appellant by the said Dr. Oliver Suehs, and one of the granulomas was removed. The web, or adhesion, was removed. Appellant claims that the web has reappeared and still exists on her vocal cords, and the granuloma which was not removed still exists on her vocal cords in the form of a nodule.

For several days following the operation appellant was unable to speak. Later, she was only able to speak in a hoarse whisper and in harsh, rasping tones. Appellant claims that she still experiences difficulty in speaking and still talks in harsh tones.

As a youth appellant was a trained vocalist and voice instructor, and still enjoyed the use of her voice by singing in various local functions. As a result of said injuries, appellant claims that she is no longer able to sing and experiences difficulty and embarrassment in speaking.

Appellant's first point of error is that of the trial court in granting judgment against appellant because there was an abundance of evidence of probative force raising fact issues that should have been submitted to the jury.

We overrule this point.

Appellant alleged that the appellee was negligent in thirty-two instances which negligent acts proximately caused injury to her vocal cords. For the purposes of this opinion it is unnecessary to state these alleged acts of negligence in detail. Appellant's case primarily rests upon the alleged negligence of appellee in attempting to thrust a No. 8 size plastic tube between appellant's vocal cords for the purpose of administering the anesthetic; that a size eight tube was too large for the opening between appellant's vocal cords; that appellee attempted to insert the No. 8 tube at least two or three times using more force than was needed on each attempt; that appellant's vocal cords were damaged thereby; that appellee subsequently attempted to place a No. 7 tube, then a No. 6 tube in the same manner, both attempts being unsuccessful; and that, finally, Dr. Hood, the surgeon who was standing by to operate, at appellee's suggestion, intubated appellant with a No. 5 tube which allowed the anesthetization to proceed as desired.

Appellant asserts that this is not a case involving the complicated fields of medicine in regard to diagnosis and treatment of a patient, but is one involving the mere physical act of inserting a plastic tube between a patient's vocal cords. Appellant further contends that the appellee had not seen appellant before the day of surgery, that appellant had an unusually small opening between the vocal cords; that appellee had not used the proper type of laryngoscope in order to view the larynx and vocal cord opening; that a gentle, twisting motion is used to insert a tube and that appellee used more force than was necessary in order to insert the tube; that appellee used too large a tube and that when Dr. Hood took over and finally inserted a smaller tube, the opening between appellant's vocal cords was bleeding and finally, that appellant did not have a laryngospasm.

The only doctors called by appellant were Doctors Hood (the surgeon in the case) Suehs and appellee. These doctors testified for approximately six days and the case is before us on an extensive record. Able counsel for appellant questioned each of the doctors thoroughly however none of this testimony discloses any negligence on the part of appellee or any causal connection between the alleged acts of negligence and the result of his unsuccessful attempts to intubate her.

The burden of proof in an alleged medical malpractice case, as stated by the Texas Supreme Court in Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R. 2d 1 (1949), is as follows:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries." 219 S.W.2d at p. 782.

Cited in more than fifty subsequent Texas cases, the Bowles case furnishes the qualitative test to be applied by Texas courts to a plaintiff's evidence in any alleged medical malpractice suit. Indeed, the above quoted language has been twice reiterated with approval by the Supreme Court, first in Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 935 (1953) and again in Hart v. Van Zandt, Tex.Sup., 399 S.W. 2d 791 (1965).

The rationale of the burden of proof rule pronounced in Bowles is explained as follows:

"As a circuit judge in Ohio, Chief Justice Taft clearly stated the principle, with the reasons supporting it, in these words: 'When a case concerns the highly specialized art of treating (disease), with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that neg-

ligence did cause the injury.' Ewing et al. v. Goode, C.C., 78 F. 442, 444. * *" 219 S.W.2d at p. 782.

This rationale was recently repeated by the Supreme Court in Hart v. Van Zandt, supra, in the following language:

"In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury. Ewing v. Goode, 78 F. 442, 444 (C. C.Ohio, 1897); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949); Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933 (1954).

In determining the question of proximate cause, the general rule is 'that proof of causation must be beyond a showing of a possibility that the injuries arose from the defendant's negligence or lack of skill, since the jury will not be permitted to speculate as to the cause of the injury. Thus where the evidence most favorably to the plaintiff develops more than one equally probable cause, for one or more of which defendant is not responsible, the plaintiff has failed to sustain his burden of proof.' 13 A.L.R. 2d 22. * * *" 399 S.W.2d at p. 792.

Of this rule, this Court said in Kaster v. Woodson, 123 S.W.2d 981 (Austin Civ.App. 1938, writ ref.):

"Such has been the law in all civilized nations since in his politics, Aristotle

wrote: 'As the physician ought to be judged by the physician, so ought men to be judged by their peers.' " 123 S.W.2d at p. 983.

█ Bearing in mind the rules stated in *Bowles* and *Hart,* the testimony given by the medical witnesses was that appellant went into a spasm of the larynx which was the principal cause of the difficulty in intubation; that while, in all probability, one of the tubes that were attempted to be inserted or the tube that was actually inserted caused the trauma that subsequently produced the damage to the vocal cords complained of, no one could point out, for certain, what tube (or for that matter, which doctor handling the various tubes) had caused the damage.

The testimony of the medical witnesses as to proximate cause can be summarized by that of Dr. Hood as follows:

"Q * * * Now, then, Doctor, you don't know which of these tubes may have caused the granulomas and the little web?

A No, sir, I do not.

Q And there is no way in the world to tell.

A No, sir.

Q You don't have any idea whether they resulted at the first, second or third effort on the part of Dr. Umstattd to intubate the patient.

A No, sir, I do not know.

Q And you don't know whether the little granulomas and web were due to the presence of the No. 5 tube during the surgery.

A No, sir. I do not. I don't know whether it caused it or not.

Q And that tube was in place over a period of something like an hour and a half.

A Yes, sir, it was.

Q And we would all agree, I am sure, that friction alone can cause injury.

A In some patients it might, yes, sir.

Q And I am talking now about injury to the vocal cords.

A Yes, sir.

Q And the movement caused by the Jefferson ventilator, while not a major movement, was present throughout the time the ventilator was on over a period of approximately an hour and twenty-five minutes.

A Yes, sir.

Q Now, the web was at the smallest part of this 'V' made by the vocal cords, according to Dr. Suehs' testimony.

A Yes, sir.

Q And I will ask you to assume that to be true for the purpose of these questions. And that being true, Doctor, didn't the smallest tube have the best chance to get to the smallest place where the vocal cords come together?

A The smaller the tube, I think the more anterior it could reside under any circumstances.

Q And the presence of this smallest tube during the surgery could have caused the web that we have been talking about.

A I think it could have been caused by that, yes, sir.

Q And this littlest tube could have also caused the granulomas, could it not?

A Yes, sir.

Q It is all just pure guesswork as to which part of the intubation procedure resulted in this minor trauma.

A As far as I am concerned, it would be.

Q * * * Now, these minor injuries could have been caused even though Dr. Umstattd used the identical technique he had used thousands of times.

A Yes, sir. * * *

Q And these minor injuries could have resulted even though Dr. Umstattd used the same standard of care that is used by anesthesiologists in this community in the exercise of ordinary care in the practice of their specialty.

A Yes, sir."

The testimony further disclosed that it is preferable to use the largest size tube possible so that more oxygen can pass to the patient's lungs with less effort on the part of the machine applying the oxygen. Consequently, with less effort on the part of the machine there is apt to be less movement of the tube between the patient's vocal cords during the operation. It is for this reason that the preferred method is to try the larger tubes first then working down to smaller sizes as necessary.

In addition, the medical witnesses testified that in their opinion, appellee had acted according to accepted standards of medical practice by anesthesiologists and that he he did not do anything which would not have been done, or failed to do anything which would have been done, in the exercise of ordinary care by anesthesiologists.

Edwards v. West Texas Hospital, 89 S.W.2d 801 (Amarillo Civ.App.1935, writ dism.), Henderson v. Mason, 386 S.W.2d 879 (El Paso Civ.App.1964, no writ), and Dobbins v. Gardner, 377 S.W.2d 665 (Houston Civ.App.1964, writ ref., n. r. e.) are cited by plaintiff as dispensing with the requirement of proof of negligence and proximate cause by testimony of a doctor where the defendant's alleged negligence "is the use of mechanical instruments, or where it is so plain as to be within common knowledge of laymen." In Edwards the defendant delivered only one twin and failed to detect the other; in Henderson reference is made as dictum to leaving surgical instruments or sponges in an incision or operating on the wrong portion of a body; and in Dobbins a gauze pack was left in the patient's body. Although these cases illustrate instances where the nature of the alleged malpractice and injuries are plainly within the common knowledge of laymen, they are not pertinent to this case. The subjects of alleged negligence in administering anesthesia and causation of granuloma and adhesion injuries to vocal cords are medically complex and specialized matters beyond the common knowledge of laymen.

Appellant's second point of error is that of the trial court in overruling her motion to declare the witness, Dr. Maurice Hood, as an adverse and hostile witness because the testimony introduced in support of such motion clearly revealed the hostility and bias of said witness against appellant.

We overrule this point.

Prior to calling Dr. Hood as a witness, plaintiff filed a motion to have him declared an adverse witness upon the grounds that since plaintiff could have named Dr. Hood as a co-defendant in this suit, he was an adverse party under Rule 182, Texas Rules of Civil Procedure, and that Dr. Hood's oral deposition established that he was a hostile witness.

Rule 182 is applicable only to one who is a party to such suit or proceedings either as plaintiff or defendant. Dr. Hood was not a party to this lawsuit. See Parker v. Traders & General Insurance Co., Tex.Civ.App., 366 S.W.2d 107, modified on other grounds, 375 S.W.2d 714, Sup.Ct.

Appellant's third point of error is that of the trial court in refusing to grant appellant a new trial because of newly discovered evidence by appellant which showed that a witness subpoenaed by appellant was in fact under the employ of the appellee, which fact resulted in the trial court making erroneous rulings in regard to questioning

by appellant's attorney and appellee's attorney, and the weight to be given these witnesses' testimony.

We overrule this point.

As best we can understand this point, appellant asserts that his witness Dr. Suehs was discovered to be in the employ of Dr. Umstattd in that appellee's attorney offered to pay Dr. Suehs a witness fee or in fact did pay Dr. Suehs a witness fee. Inasmuch as this case turns on the no evidence rule, if error was committed here, it is harmless, Rule 434, T.R.C.P.

■ Appellant's points of error four and five, briefed together, are that of the trial court in sustaining appellee's exceptions to appellant's questions propounded to Dr. Oliver Suehs inquiring into whether said Doctor desired to testify against the defendant or any other medical doctor because said questions were calculated to and would have shown if any bias existed on the part of said witness, and would have given the opportunity to the appellant to explore said biases or prejudices; the error of the trial court in overruling plaintiff's objections to the testimony of Dr. Oliver Suehs, because such testimony contained conclusions based on matters not in evidence and therefore invaded the province of the jury.

We overrule these points.

With respect to appellant's point of error number four, the court's ruling was correct in that appellant was attempting to impeach her own witnesses. See this Court's opinion in Whitfield v. Traders & General Insurance Company, 136 S.W.2d 626.

■ With respect to appellant's point of error number five, we repeat that since the case is controlled by the no evidence rule, should there have been any error here, it was harmless error under Rule 434, T.R.C.P.

■ Appellant's point of error number six is that of the trial court in refusing to grant the plaintiff's motion for directed verdict, because the undisputed evidence showed an intentional trespass on appellant by appellee.

We overrule this point.

Before the operation, appellant signed the following "Consent to Operation and Anesthesia" which is as follows:

## "BRACKENRIDGE HOSPITAL

### CONSENT TO OPERATION AND ANESTHESIA

\* \* \* \* \* \*

It is hereby requested that the following operation be performed on Xenia Bell, and this constitutes my voluntary consent and an unconditional grant of authority by me to Dr. Garcia & Dr. Hood of the staff of Brackenridge Hospital, to cause any anesthetic to be administered and to do the following: Aortic Graft and all surgery and procedures reasonably related thereto and deemed necessary by the above-named physician at the time of the operation. I have been fully informed of the nature of this operation and its possible consequences.

Dated: 3/12/62

/s/ Xenia D. Bell
Patient"

Before surgery, appellant was informed that the anesthetic to be administered would be halothane, and she made no inquiry regarding the method to be used in administering it.

Appellant cites an opinion of the San Antonio Court of Civil Appeals, in Scott v. Wilson, 396 S.W.2d 532, application for writ of error pending, wherein the Court held that a doctor had the duty to fully inform his patient of the nature of operation known as stapedectomy with vein graft; that the doctor should have informed the patient of the process contemplated, the dangers and hazards of the operation to-

gether with chances of restored hearing in order to enable patient to choose between the operation or living with impaired hearing.

We do not have the same situation here as in Scott. The main operation upon appellant was an Aortic Graft and all surgery and procedures reasonably related thereto and deemed necessary by her surgeon at the time of the operation. The anesthetic was incidental to this operation, was necessary in order to perform the operation and, in fact, appellant had consented to "any anesthetic to be administered." Under these circumstances, the appellee, barring inquiry, was not under a duty to disclose the method he or the surgeon would select in administering the anesthetic. Dr. Hood testified that he would not have performed appellant's surgery with the administration of anesthesia by any method other than the endotracheal tube method. Surgical operation may consist of many steps and involve many specialists. It would, indeed, be unreasonable and undesirable to place a burden of full and complete disclosure upon each and every specialist involved as to the specific methods intended to be used in an operation and all of the possible risks involved in each step of an operation. See Hall v. United States, D.C., 136 F.Supp. 187, affirmed 5 Cir., 234 F.2d 811.

Appellant's point of error number seven is that of the trial court in refusing to apply the doctrine of res ipsa loquitur to the facts presented in this cause, because this doctrine is clearly applicable under the facts of this case.

We overrule this point.

This Court has repeatedly held that the doctrine of res ipsa loquitur does not apply in a malpractice case. See Floyd v. Michie, Tex.Civ.App., 11 S.W.2d 657 and Kaster v. Woodson, Tex.Civ.App., 123 S.W.2d 981. See also an opinion of the San Antonio Court in Barker v. Heaney, 82 S.W.2d 417.

Appellee has a motion before this Court that the original of the deposition of Dr. Maurice Hood heretofore filed in this Court is not a part of the transcript or statement of facts in this cause and should be stricken from the appellate record. In support of this contention he cites Rules 371, 372(d) and 379. Texas Rules of Civil Procedure.

We have read the portions of the deposition cited by appellant. Since the deposition could only have been offered for impeachment purposes, and since our decision would have been the same irrespective of the conflict in Dr. Hood's testimony, if any error was committed in bringing up the deposition in the manner complained of, it was harmless error under Rule 434, T.R.C.P. Consequently, in view of our decision in the matter, we dismiss appellee's motion.

We affirm the judgment of the trial court.

Affirmed.

HUGHES, Justice (dissenting).

It is my opinion that the majority has failed to state the case from appellant's point of view as required in passing upon the propriety of an instructed verdict in a case tried to a jury. Hart v. Van Zandt, Tex.Sup.Ct., 399 S.W.2d 791, Abrams v. Brent, 362 S.W.2d 155, Austin, writ ref., n. r. e. Nevertheless, I am of the opinion that the Court has reached a correct result insofar as the lack of medical proof of negligence of appellee, except as noted below, is concerned.

I am of the opinion, however, that an issue of fact was made as to whether appellee committed a trespass upon appellant in inserting or attempting to insert between her vocal cords a rather large plastic tube without explaining to her, since there was no emergency present, the different methods of administering anesthetics and giving her the choice of the method to be employed. This theory of trespass evolves from the doctrine of informed consent of

the patient to surgery and medical treatment, a doctrine which is generally applicable in malpractice suits. See Scott v. Wilson, 396 S.W.2d 532, San Antonio, application for writ of error pending, Hall v. United States, D.C., 136 F.Supp. 187, affirmed, 234 F.2d 811 (5th Cir.), Mayor v. Dowsett, 400 P.2d 234, Supreme Court of Oregon.

Hall v. United States, supra, holds that this doctrine applies to the administering of anesthetics.

Scott v. Wilson, supra, is the subject of an excellent note in 44 Tex.Law Review, 799. The author was critical of the opinion for the reason that consent to the operation having been given by the patient the duty of the doctor to inform as to the risks involved, he believed, should be determined on the basis of negligence rather than on the theory of assault and battery. This distinction is of paramount importance because if negligence must be established then hard to come by medical testimony must be obtained to sustain it. This would not be true under the trespass theory.

In this case there is, in my opinion, medical testimony upon which negligence of the appellee in failure to explain and give appellant a choice of how the anesthetic was to be administered could be based, which testimony is:

"A * * * We see the patients in a get-acquainted type visit, and give them some idea of what to expect from the anesthesia standpoint, being careful to allay fears without trying to initiate any.

*　　*　　*　　*　　*　　*

Q Now, you don't tell the patient, as an accepted procedure, the type method you have selected to administer the anesthesia?

A We give them a general idea of what to expect from the type of administration, yes.

Q Do they have a choice?

A We give them an opportunity to deny it. Our visit is more of a visit more dependent upon the patient's response to our being there, our presence. If the patient is anxious to talk, we will stand there or sit there and talk with them as long as they want to, of course, but we don't like to draw out our pre-operative visit on our own accord.

Q All right. Doctor, you are saying that the patient has a choice or doesn't have a choice,—do they?

A In the final analysis, yes, they have a choice."

An anesthesiologist is responsible for his negligence as is a surgeon. Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933. Whether his services are but an "incident" of the operation, as the majority states, is, therefore, of no consequence. Such services are, however, of the greatest importance to the patient since the anesthesiologist holds the life of the patient in his hands.

I respectfully dissent.