Edwin TAJCHMAN and Peggy Ann Tajchman, as Next Friends for their Daughter, Margaret Anne Tajchman, Appellants,

v.

Dr. Cole GILLER and Dr. Jerry Adderholt, Appellees.

No. 05–95–01191–CV.

Court of Appeals of Texas, Dallas.

Dec. 6, 1996.

Rehearing Overruled Jan. 28, 1997.

Thomas Hight, Jr., Hight & Hight, P.C., Dallas, Thomas Black, San Antonio, for Appellants.

Stephen W. Johnson, Martha L. Strother, Johnson & Sylvan, P.C., Dallas, Winston L. Borum, Tricia Martin, Burford & Ryburn, L.L.P., Dallas, for Appellees.

Before LAGARDE, WRIGHT and WOLFE JJ.

WOLFE, Justice.

Edwin Tajchman and Peggy Ann Tajchman, as next friends for their daughter, Margaret Anne Tajchman, appeal from a summary judgment granted in favor of Dr. Cole Giller and Dr. Jerry Adderholt. The Tajchmans sued Doctors Giller and Adderholt, alleging that they were negligent in failing to obtain Margaret Tajchman's informed consent prior to a Depth Electrode Placement (DEP) procedure. The Tajchmans sued Dr. Giller alone for allegedly violating the Deceptive Trade Practices Act. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b) (Vernon Supp. 1996). In two points of error, the Tajchmans contend that the trial court erred in granting summary judgment on both claims. We affirm the trial court's judgment.

## Background

Margaret Tajchman suffered from epilepsy to the extent that she was unable to drive or swim, and her condition was potentially life-threatening. To alleviate this condition, Ms. Tajchman considered surgery that would remove the part of her brain responsible for her epileptic seizures. Preliminary to the actual surgery, Ms. Tajchman's doctors recommended a DEP, a procedure in which probes are placed into the brain to monitor brain functioning more precisely than other scans and routine electroencephalograms.

In January 1992, Ms. Tajchman consulted with Dr. Giller regarding the DEP procedure. After several consultations during which Ms. Tajchman's doctors showed her slides, provided a written description of the procedure, and demonstrated the procedure on a model of the brain, Ms. Tajchman signed a written consent form and agreed to undergo the procedure. The consent form, among other things, set forth the following risks and hazards:

1) Additional loss of brain function including memory. 2) Recurrence or continuation of the condition that required the operation. 3) Stroke. 4) Blindness, deafness, inability to smell, double vision, coordination loss, seizures, pain, numbness and paralysis. Meningitis. Brain abscess.

Ms. Tajchman's mother, who was present when Ms. Tajchman signed the form, stated that Ms. Tajchman read and understood the consent form before signing it. Moreover, the consent form contained the following provision:

I (we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to be used, and the risks and hazards involved, and I(we) believe that I(we) have sufficient information to give this informed consent.

Ms. Tajchman was a fully competent adult at the time she signed the consent form.

As part of the DEP procedure performed by Doctors Giller and Adderholt, they cut a vein in Ms. Tajchman's brain. The Tajchmans acknowledge that this was a routine part of the DEP procedure. However, in Ms. Tajchman's case, this part of the procedure resulted in a venous infarct (bleeding of a vein), which is a type of stroke. While the doctors did not specifically tell Ms. Tajchman that they would cut one of her veins, they did inform her that a venous infarct was a risk associated with the DEP procedure. Further, the consent form listed "stroke" as a potential risk.

The Tajchmans sued Doctors Giller and Adderholt, alleging that the doctors were negligent in not obtaining Ms. Tajchman's informed consent and that Dr. Giller had violated the DTPA in misrepresenting who would be performing the DEP procedure. Doctors Giller and Adderholt filed motions for summary judgment on the grounds that no issue of material fact existed as to whether Ms. Tajchman gave her informed consent

to the DEP procedure or whether Dr. Giller made misrepresentations or express warranties that would subject him to liability under the DTPA. The trial court granted both doctors' motions for summary judgment.

## Standard of Review

■ The function of summary judgment is not to deprive a litigant of the right to a full hearing on the merits of any real issue of fact but to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). In reviewing a summary judgment record, this Court applies the following standards:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true.

3. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in his favor.

*Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). The purpose of the summary judgment rule is not to provide either a trial by deposition or a trial by affidavit but is to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that no genuine issue of fact remains. *See Gaines v. Hamman,* 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). For the defendant, as movant, to prevail on a summary judgment, he must either disprove at least one element of the plaintiff's theory of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *See International Union UAW Local 119 v. Johnson Controls, Inc.,* 813 S.W.2d 558, 563 (Tex.App.—Dallas 1991, writ denied).

## Informed Consent

In their first point of error, the Tajchmans assert that the trial court erred in granting summary judgment on their claim that the doctors did not obtain Ms. Tajchman's informed consent to the DEP procedure. Specifically, the Tajchmans claim that the law of informed consent required the doctors to disclose that the DEP procedure would require the cutting of Ms. Tajchman's vein.

■ Recovery for a claim that a doctor failed to fully inform a patient of the risks of surgery is governed by the Medical Liability and Insurance Improvement Act. TEX.REV. CIV. STAT. ANN. art. 4590i, §§ 6.01–.07 (Vernon Supp.1996). The Act created the Texas Medical Disclosure Panel to determine which risks and hazards must be disclosed to patients undergoing medical care and surgical procedures. The panel evaluates medical treatments and surgical procedures and may place them on either List A or List B. List A procedures require some disclosure of the risks involved in the treatment, but List B procedures require no disclosure. A rebuttable presumption that the physician was not negligent exists if the panel's guidelines are followed. *Id.* § 6.07. If a procedure is not on either list, as in the case before us, then the doctor is under the "duty otherwise imposed by law." *Id.* § 6.07(b). That duty is to disclose all risks and hazards which could influence a reasonable person in making his or her decision to consent to the procedure. *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex.1983).

■ After reviewing the record before us, we find that the part of the DEP procedure that involved cutting Ms. Tajchman's vein was not a "risk" or a "hazard" as contemplated by the Act. In the informed consent context, the risks and hazards associated with a procedure must be disclosed if they could influence a reasonable person in making the decision whether to consent to the procedure. Neither risk nor hazard is defined in the Act. Therefore, we use the plain and ordinary definitions of these terms. The term "risk" refers to "the possibility of suffering harm or loss." AMERICAN HERITAGE DICTIONARY 1065 (2d college ed.1991). A "hazard" is "a chance of being injured or harmed." *Id.* at 598. Thus, the phrase "risks or hazards" denotes a set of negative results. A "procedure" is a "way of perform-

ing or effecting something; an act composed of steps." *Id.* at 987; *see Key Life Ins. Co. v. Davis,* 509 S.W.2d 403, 405 (Tex.Civ. App.—Beaumont 1974, no writ).

The "risks and hazards" posed by the DEP procedure included stroke and brain damage, the precise negative results of which Ms. Tajchman was informed and from which she suffered. The cutting of the vein at issue in the instant case is clearly a particular step adopted for doing or accomplishing the DEP procedure. The cutting is not a risk or hazard in and of itself. The mechanics of how the risks became reality is not the proper focus in this case, and we cannot accept the Tajchmans' characterization of one step in the DEP procedure as a "risk." The Tajchmans acknowledge that cutting a vein was a routine part of the DEP procedure. Thus, Ms. Tajchman's claim that her doctors failed to inform her of a "risk" associated with the DEP, cutting a vein, is insupportable.

■ Binding Texas precedent confirms our conclusion that Doctors Giller and Adderholt had no duty to disclose that part of the DEP procedure that involved cutting Ms. Tajchman's vein in order to obtain informed consent to perform the procedure. In *Barclay v. Campbell,* 704 S.W.2d 8 (Tex.1986), the supreme court emphasized that only inherent risks of a procedure—risks that arise from the procedure itself and not from any defect in the procedure or negligent human intervention—need be disclosed to obtain informed consent. *Id.* at 10.

In *Barclay,* the plaintiff alleged, among other things, that his doctor negligently failed to disclose that a drug he prescribed to treat Barclay's schizophrenia could produce a condition known as tardive dyskinesia. Evidence showed that the risk of developing this condition was small to extremely small. The trial court directed a verdict for the defendant, and the court of appeals affirmed, concluding that this testimony constituted no evidence that the risk was material. *Id.* at 9.

The supreme court reversed. In deciding that the plaintiff was entitled to a jury issue on the question of informed consent, the supreme court focussed on evidence showing that tardive dyskinesia was an inherent risk

of using the prescribed drug and that this risk was material enough to influence the person deciding whether to use the drugs. In determining that tardive dyskinesia was an inherent risk of using the drugs, thus mandating disclosure, the court focussed on the fact that "[t]ardive dyskinesia arises from the use of the drug and not from any defect in the drug or negligent human intervention." *Id.* at 10.

We interpret and apply *Barclay* in light of a seminal informed consent case, *Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). In *Canterbury,* the defendant failed to disclose that the paralysis the plaintiff developed after undergoing a laminectomy was a risk of that surgical procedure. The trial court directed a verdict for the surgeon, but the court of appeals reversed, holding that the plaintiff had made out a prima facie case that the surgeon failed to obtain informed consent.

In explaining its reasoning, the court of appeals explored the origins and rationale of the physician's duty to disclose risks to his patient. The court also examined the scope of the disclosure requirement, exhaustively reviewing the sizeable body of law discussing a physician's duty to disclose the risks and alternatives to proposed treatment. Referring to the scope or "breadth of the disclosure of risks legally to be required," the court reasoned that "[t]he topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment." *Id.* at 787. From the court's comments, it clearly contemplated requiring disclosure only of conditions resulting from the proposed procedure:

> "The factors contributing significance to the dangerousness of a medical technique are, of course, the incidence of injury and the degree of harm threatened. A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of the therapy ... may summons discussion with the patient."

*Id.* at 788. Accordingly, "the very purpose of the disclosure rule is to protect the patient

against *consequences* which, if known, he would have avoided by foregoing the treatment." *Id.* at 790 (emphasis added).

Both *Barclay,* and its precursor *Canterbury,* limit their disclosure requirement to the consequences of a proposed medical procedure, exclusive of the means by which that procedure is performed. We thus conclude that *Barclay* requires that only inherent risks that result from the medical procedures performed—and not defects or steps in the procedure itself—must be disclosed to obtain informed consent. *See also McKinley v. Stripling,* 763 S.W.2d 407, 409 (Tex.1989) (also focusing on the necessity of disclosing undesirable surgical results).

Applying this holding to our own case, Doctors Giller and Adderholt informed Ms. Tajchman in abundant detail of the exact material risks—stroke and brain damage— that were inherent consequences of the DEP procedure performed and which, unfortunately, she suffered. The cutting of the vein at issue was a part of the procedure itself and not a consequence of the procedure. Therefore, this step in the procedure was not a risk or hazard that required disclosure.

We additionally decline to accept the Tajchmans' definition of "risk" because it would require doctors to burden patients with every conceivable detail of a procedure and memorialize the details on the consent form. Surgical operations may consist of many steps and involve many specialists. *Bell v. Umstattd,* 401 S.W.2d 306, 313 (Tex. Civ.App.—Austin 1966, writ dism'd). It would be unreasonable and undesirable to place the burden of obtaining full and complete disclosure and informed consent upon each and every specialist involved as to the specific methods intended to be used in each step of an operation. *See id.* Because Ms. Tajchman was informed about the risks and hazards associated with the DEP and signed a consent form that set forth these risks, her consent was informed.

■ Relying on a number of cases in which there was no warning of a particular risk, the Tajchmans assert that a fact issue exists whether a reasonable person would have consented to the DEP if she had known that cutting a vein was part of the DEP

procedure. However, the "reasonable person" analysis is only required when the patient is *not* informed of a material risk inherent to the medical procedure performed. *See, e.g., Barclay,* 704 S.W.2d at 10. When the patient is informed of the risk that occurs and causes injury, as here, the question of what a "reasonable person" would have done is not at issue. The fact is that the patient in this case, Ms. Tajchman, knew of the risk of stroke yet nevertheless consented to the DEP procedure. For this reason, the cases in which a risk was not disclosed do not apply to this case. The Tajchmans' point of error number one is overruled.

## DTPA Claim

■ In their second point of error, the Tajchmans assert that Dr. Giller misrepresented who would place the electrodes during the DEP and that misrepresentation constituted a deceptive trade practice under the DTPA. Ms. Tajchman claims that she consented to having only Dr. Giller place the electrodes during the DEP procedure. Further, Ms. Tajchman claims that Dr. Giller's statement that he "would be doing the procedure" was a violation of the DTPA because Dr. Adderholt in fact assisted Dr. Giller in placing the electrodes during the procedure.

The consent form that Ms. Tajchman signed specifically names both Dr. Giller and Dr. Adderholt and voluntarily requests them, as her physicians, to treat her condition. Further, Ms. Tajchman's reliance on *Sorokolit v. Rhodes,* 889 S.W.2d 239 (Tex.1994), is misplaced. The Medical Liability and Insurance Improvement Act bars the characterization of medical negligence claims as DTPA claims. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 12.01(a) (Vernon Supp.1996). It is true that *Sorokolit* holds that section 12.01(a) of the Act does not preclude suits against a doctor for "knowing misrepresentations or breach of express warranty." *Sorokolit,* 889 S.W.2d at 243. However, in this case, Dr. Adderholt's name is listed on the consent form, and the doctors made no express warranty regarding the success of the DEP procedure. In fact, the doctors provided Ms. Tajchman with a written description of the DEP procedure and showed her a model and

slides designed to bring home the seriousness of the DEP and the risks it entailed. Under these facts, we find as a matter of law that there was neither a misrepresentation nor an express warranty, and summary judgment was appropriate. The Tajchmans' point of error number two is overruled.

Accordingly, we affirm the trial court's judgment.

Wright, J., dissents with opinion.

WRIGHT, Justice, dissenting.

Because I would conclude (1) cutting a vein in Margaret Tajchman's (Tajchman) brain was an undisclosed "risk or hazard" of the DEP, and (2) there is an issue of material fact about whether a reasonable person might have been influenced in deciding whether to consent to the DEP, I respectfully dissent.

## SUMMARY JUDGMENT

### Standard of Review

The function of summary judgment is not to deprive a litigant of the right to a full hearing on the merits of any real issue of fact but to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). In reviewing a summary-judgment record, this Court applies the well-known summary judgment standards. *See Nixon v. Mr. Property Management Co. Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985).

When the defendant is the movant, summary judgment is proper only if the plaintiff cannot, as a matter of law, succeed upon any theory pleaded. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex.1983). Thus, the defendant can prevail by conclusively establishing against the plaintiff at least one factual element of each theory pleaded by the plaintiff, *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991), or by conclusively establishing each essential element of an affirmative defense. *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Conversely, the plaintiff can bar summary judgment by presenting evidence that creates a fact question on those elements of the plaintiff's case under attack

by the defendant, or on at least one element of each affirmative defense advanced by the defendant. *Torres v. Western Casualty & Sur. Co.,* 457 S.W.2d 50, 52 (Tex.1970).

### Informed Consent

Informed consent, as it relates to a medical malpractice claim, is governed by the Medical Liability and Insurance Improvement Act. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, §§ 6.01–.07 (Vernon Supp.1996) (the Act). The Act created the Texas Medical Disclosure Panel (the Panel) to determine which risks and hazards must be disclosed to patients undergoing medical care and surgical procedures. The Panel evaluates medical treatments and surgical procedures and provides guidelines about disclosure of risks. The Panel formulates two lists, List A and List B. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 6.07 (Vernon Supp.1996). If a procedure is not on either List A or List B, then the doctor is under a duty to disclose all risks or hazards which could influence a reasonable person in making a decision to give or withhold consent to the procedure. *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex.1983).

In appellees' motion for summary judgment, they contended they were entitled to summary judgment because they fully and completely informed Tajchman of the risks and hazards involved in the DEP procedure. Therefore, to bar summary judgment, appellants had to present expert testimony showing that the risk complained of: (1) was inherent to the medical or surgical procedure undertaken; and (2) was material, in that it could influence a reasonable person's decision to consent to the procedure. *See Barclay v. Campbell,* 704 S.W.2d 8, 9 (Tex.1986); *Knapp v. Eppright,* 783 S.W.2d 293, 296 (Tex.App.—Houston [14th Dist.] 1989, no writ). Expert testimony that a risk was "small to extremely small" is some evidence that the risk was material enough to influence a reasonable person to give or withhold consent to treatment. *See Barclay,* 704 S.W.2d at 10.

### Application of Law to Facts

In point of error one, appellants contend the trial court erred in granting summary

judgment because there are material issues of fact about whether appellees adequately informed Tajchman of the risks and hazards associated with the DEP. I agree.

I disagree with the majority that the part of the DEP procedure that involved cutting the vein in Tajchman's brain was not a "risk" or "hazard" as contemplated by the Act. The majority contends that because the cutting of the vein was a "part of the procedure itself and not a consequence of the procedure," it was not a risk or hazard of the procedure. However, a risk may also be "a dangerous element or factor." WEBSTER'S 3RD INTERNATIONAL DICTIONARY 1961 (9th ed.1993). Although I agree with the majority that risks or hazards may be consequences of procedures, I do not believe the Act limits risks or hazards only to end results. For instance, the Disclosure Panel requires a patient undergoing an osteotomy, or surgical cutting of the bone, to be informed that the doctor may be required to remove or replace an existing implanted device in the bone while performing the procedure. Thus, I would conclude the Act contemplates that a risk may be a dangerous element or factor, as well as a set of negative consequences of each separate procedure performed. I would also conclude that the cutting of the vein, while admittedly not an end result, was nonetheless a dangerous element of the DEP procedure. I would further conclude that as a dangerous element or factor of the procedure, cutting the vein was a risk associated with the procedure which required disclosure.

Dr. Giller, the primary neurosurgeon, testified that Tajchman's brain injury was caused by the deliberate cutting of a vein in the process of placing the probe. Giller testified that prior to Tajchman's injury, he routinely cut veins that were in the way of probe placement because they were in an area where they could be safely cut. Giller testified it was "a very unusual circumstance" that Tajchman depended on the cut vein for drainage to a portion of her brain. Giller testified that after Tajchman's injury, he no longer routinely cuts the veins. Thus, a change in his procedure has now reduced this risk. I would conclude that Giller's expert testimony established that the risk was inherent to the DEP procedure as performed and created a fact issue about whether the risk was material enough to influence a reasonable person to give or withhold consent to treatment if it had been disclosed. I would sustain appellants' first point of error, reverse the trial court's summary judgment, and remand to the trial court for further proceedings.